595 S.E.2d 864

**Frank GORDON, Jr., as Attorney–in–Fact
for Dorothy Gordon, Respondent,**

v.

**Rudolph Robert DREWS, and Raymond Beasley, Appellants.**

No. 3775.

Court of Appeals of South Carolina.

Submitted Dec. 8, 2003.

Decided April 12, 2004.

Rehearing Denied May 20, 2004.

600

Kerry W. Koon, of Charleston, for Appellants.

Justin O'Toole Lucey, of Mt. Pleasant, for Respondent.

CURETON, A.J.:

Respondent Frank Gordon [1] brought this action against Rudolph Robert Drews alleging the illegal sale of stock in a corporation, misrepresentation, and breach of fiduciary duty. The trial court: (1) found Drews liable for the sale of unregistered securities in the sum of $50,000; (2) dismissed the other claims; and (3) awarded interest and attorney's fees. Drews appeals. We affirm.

## FACTS/PROCEDURAL HISTORY

Drews and his business partner, Raymond Beasley, decided to open a hardware store in the West Ashley area of Charleston in 1996. The store, known as Builders Station, was incorporated, and its board of directors approved a business plan and capital structure that provided for the sale of stock to outside investors.

Drews and Beasley agreed that each would own a twenty-five percent share of stock in Builders Station. The other half of the outstanding shares would be sold to outside investors. Drews and Beasley also agreed they would each acquire an additional one-half share for each share issued to outsiders. Ultimately, Builders Station had eleven shareholders.

Among the investors the company was able to attract was Frank Gordon. On several occasions, Gordon discussed with

---

1. Gordon brought this action on behalf of his mother, Dorothy Gordon. Gordon used his mother's funds to purchase the stocks in question and acted at all times on her behalf.

Drews and Beasley the possibility of investing in the new store. Before agreeing to purchase shares, Gordon asked about the capital structure of the company. Gordon testified he expressed concern that "the monies put in by investors were no where [sic] near sufficient." Drews reportedly tried to allay his concern by informing Gordon the company anticipated receiving a $250,000 loan that would be guaranteed by the Small Business Administration. Gordon also claimed Drews and Beasley made oral representations that receipt of the loan was all but certain by assuring Gordon it was a "done deal" or "in the bag." After receiving assurances from Drews and Beasley, Gordon purchased fifty shares at $1,000 per share.

The $250,000 loan, however, never came to fruition. When Drews originally negotiated the terms of the loan, he agreed to pledge several parcels of real property he owned as collateral. He later sought to revise the terms, seeking a right of indemnification for his collateral, additional compensation, or both. Drews' attempts to renegotiate the loan delayed and ultimately prevented its consummation.

The company's board of directors (of which all eleven shareholders were members) learned of the dispute over the guaranty and collateralization of the SBA loan in November 1996. Despite the Board's additional attempts to obtain the loan, the issue was never resolved. The Board later decided to end Drews' relationship with the company. Ultimately, a "Release and Settlement Agreement" was executed releasing Drews and the shareholders from all liability arising out of their business relationship with the corporation. Though a majority of the shareholders signed the Release, Frank Gordon refused.

The business did not succeed and ultimately closed in October 1997.

Gordon brought suit against Drews, claiming the sale of stock was illegal and fraudulent under section 35–1–1490 of the Uniform Securities Act, S.C.Code Ann. §§ 35–1–10 to – 1590 (Supp.2003).[2] He also asserted claims for common-law

---

2. There have been no substantive changes to the Uniform Securities Act since the underlying cause of action arose. Accordingly, we cite to the most current version of the Act.

misrepresentation and breach of fiduciary duty in connection with Drews' sale of the stock.

The trial court found Drews was liable under section 35–1–1490(1) for the illegal sale of unregistered securities. The court concluded, however, that Drews was not liable for the fraudulent sale of stock under section 35–1–1490(2), nor for common-law misrepresentation or breach of fiduciary duty. Drews appeals.

## STANDARD OF REVIEW

Section 35–1–1490 provides that a person who purchases a security as a result of an illegal or fraudulent sale or offer "may sue either at law or in equity to recover the consideration paid for the security." S.C.Code Ann. § 35–1–1490 (Supp.2003).

■ To determine whether this suit is legal or equitable, we must look to the "main purpose" of the action as reflected by the nature of the pleadings and proof, and the character of relief sought under them. *Ins. Fin. Servs., Inc. v. South Carolina Ins. Co.*, 271 S.C. 289, 293, 247 S.E.2d 315, 318 (1978); *see also Alford v. Martin*, 176 S.C. 207, 212, 180 S.E. 13, 15 (1935) (finding "[t]he character of an action is determined by the complaint in its main purpose and broad outlines and not merely by allegations that are merely incidental"); *Nat'l Bank of South Carolina v. Daniels*, 283 S.C. 438, 440, 322 S.E.2d 689, 690 (Ct.App.1984) (noting that, although the determination of whether an action is legal or equitable "must be determined from the character of the action as framed in the complaint," the court may also consider "the prayer for relief and any other facts and circumstances which throw light upon the main purpose of the action").

■ In this action, the only cause of action before this Court is Gordon's claim seeking return of the price he paid for the Builders Supply stock. Furthermore, this was the exclusive remedy allowed by the trial court. The action, therefore, is rescissionary in nature and is appropriately reviewed under the equitable standard of review. *See Brown v. Greenwood Sch. Dist. 50 Bd. of Trustees*, 344 S.C. 522, 525, 544 S.E.2d

642, 643 (Ct.App.2001) (holding an action to rescind a contract was equitable in nature).

■ Accordingly, this Court may "find facts in accordance with its views of the preponderance of the evidence." *Townes Assocs. v. City of Greenville,* 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976). Our broad scope of review, however, does not require this Court to disregard the findings of the trial judge who saw and heard the witnesses and was in a better position to judge their credibility. *Ingram v. Kasey's Assocs.,* 340 S.C. 98, 105, 531 S.E.2d 287, 291 (2000).

## LAW/ANALYSIS

### I. Drews' Liability Under the Securities Act

The South Carolina Uniform Securities Act prohibits the sale of securities in this state unless the securities are properly registered with the securities commissioner or the securities are subject to an exemption. *See* S.C.Code Ann. § 35–1–810 (Supp.2003). Drews admits the Builders Supply stock at issue in this case was not registered with the commissioner. Drews, however, claims he is not liable for the illegal sale of stock because (A) the stock offering was an exempt transaction under the Securities Act, and (B) he did not participate in the sale of the stock.

### A. Exemption from Registration Requirement

■ Drews argues the trial court erred in finding the offering of stock in Builders Station was not exempt from registration as a limited offering. We disagree.

There are numerous registration exemptions provided for under the Securities Act in sections 35–1–310 and 35–1–320. Only one of these exemptions—the "limited offering" exemption—arguably applies in the present case. Section 35–1–320(9) defines this exemption, in pertinent part, as follow:

> Any transaction pursuant to an offer directed by the offeror to not more than twenty-five persons ... in this State during any period of twelve consecutive months, whether or not the offeror or any of the offerees is then present in this State, if (a) the seller reasonably believes that all the buyers in this State ... are purchasing for investment and (b) no

commission or other remuneration is paid or given directly or indirectly for soliciting any prospective buyer in this State.

S.C.Code Ann. § 35–1–320(9) (Supp.2003). Specifically at issue in the present case is (1) whether Drews offered the Builders Station stock to more than twenty-five people and (2) whether Drews received remuneration for soliciting the potential buyers.

 We are mindful that we must narrowly construe exemptions under the Act because the securities laws are remedial in nature and, therefore, should be liberally construed to protect investors. *McGaha v. Mosley*, 283 S.C. 268, 273, 322 S.E.2d 461, 464 (Ct.App.1984). Furthermore, in arguing the Builders Station stock was exempt from the Act's registration requirements, Drews bears the burden of proving he was entitled to the claimed exemption. S.C.Code Ann. § 35–1–340 (Supp.2003). We find he has failed to satisfy this burden.

### 1. Number of Offerees

██ We find Drews failed to sufficiently prove he offered Builders Station stock to no more than twenty-five people.

Drews presented no evidence regarding the number of people to whom he offered stock. Raymond Beasley, Drews' original business partner, testified that Drews probably offered the stock to "dozens" of people. He further testified, "I believe we did it to more than 25 people" and that Drews offered the stock to "dozens and dozens."

██ Drews attempts to circumvent this obvious lack of proof by arguing the limited offering exemption applies when there are not more than twenty-five "ultimate purchasers" of the offered security. This assertion is without merit.

As always, we look first to the plain meaning of the statute when interpreting its language. *See Hitachi Data Sys. Corp. v. Leatherman*, 309 S.C. 174, 178, 420 S.E.2d 843, 846 (1992) (holding that words used in a statute "must be given their plain and ordinary meaning without resort to subtle or forced construction to limit or expand its operation"). Under the plain language of section 35–1–320(9), we find this Court is

compelled to reject Drews' contention that the exemption applies to all transactions involving twenty-five or fewer "purchasers." The statute speaks only in terms of an "offer," not a "sale" or "purchase." The Securities Act specifically defines "offer" and "offer to sell" as including "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value." S.C.Code Ann. § 35–1–20(13)(b) (Supp.2003). We glean no intent on the part of the General Assembly to veer from the plain meaning of this statutory language.

Though our courts have not addressed the application of our state's limited offering exemption, similar exemptions under the federal securities laws have been interpreted to require a consideration of the number of offerees, not ultimate purchasers. *See, e.g., Doran v. Petroleum Mgmt. Corp.,* 545 F.2d 893, 900 (5th Cir.1977) (holding that under the private offering exemption of 15 U.S.C.A. § 77d(2), "[t]he number of offerees, not the number of purchasers, is the relevant figure in considering the number of persons involved in an offering"); *SEC v. Kenton Capital, Ltd.,* 69 F.Supp.2d 1, 11 (D.D.C.1998) (finding the "number of offerees" to be a critical factor in determining whether the private placement exemption applies); *see also* 69A Am.Jur.2d *Securities Regulation* § 143 (1993) (commenting that "the failure to prove the number of offerees, not the number of ultimate purchasers, is fatal to the claim of the [limited offering] exemption").

Although there were only eleven "ultimate purchasers" in this case, a clear reading of the statute reveals that it is the number of offerees, not the number of ultimate purchasers, with which we are concerned. The only evidence presented concerning this question was Beasley's testimony that the stock was offered to more than twenty-five people. Because Drews did not introduce any evidence to the contrary, we conclude Drews failed to meet his burden to prove Builders Supply stock was offered to no more than twenty-five persons.

### 2. Remuneration for Sales

We find Drews is also barred from claiming the limited offering exemption because he received compensation for his sales of the Builders Supply stock.

For each share of Builders Supply stock Drews sold to outside investors, he received an additional one-half share of stock. Drews argues he and Beasley each received an additional one-half share in order to maintain their status as fifty percent shareholders in the corporation, not as compensation for selling stock. We disagree with this characterization.

Again, we look first to the plain meaning of the statutory language. "Remuneration" is defined as "payment; compensation" and "the act of paying or compensating." *Black's Law Dictionary* 1298 (7th ed.1999). Other jurisdictions have held that similar share distribution schemes constituted compensation for purposes of determining remuneration under their securities laws. *See, e.g., PIC Oil Co. v. Grisham*, 702 P.2d 28, 33 (Okl.1985) (holding that receipt of securities by promoters for prices substantially below those paid by outside investors amounted to indirect compensation because the "effect of the interests retained by the [promoters] was to dilute the equity paid by outside investors and to mislead. [the outside investors] . . . into believing that [promoters] were contributing a proportionate share of capital for interests retained"); *Prince v. Heritage Oil Co.*, 109 Mich.App. 189, 311 N.W.2d 741, 746 (1981) (holding the sale of undivided fractional interests in oil and gas leases constituted the sale of securities, and the retention of leasehold working interests in the wells amounted to remuneration).

There is no question that the additional shares Drews received when selling the stock represented an increase in the value of his interest in the corporation. For every two shares Drews sold, he received another share. Thus, he received something of value for work he performed. We conclude the trial court did not err in finding Drews was remunerated for the sale of Builders Supply stock.

## B. Liability as Seller of Unregistered Security

Drews contends the trial court erred in finding he was liable as a "person who offers or sells a security" as defined under the Securities Act. We disagree.

Section 35–1–1490 is the operative provision imposing liability on those who engage in the illegal sale of stock. In pertinent part, it provides:

Any person who:

(1) offers or sells a security in violation [of the registration requirements of the Securities Act] ... or

(2) Offers or sells a security by means of any untrue statement of material fact or any omission to state a material fact ..., the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission;

Is liable to the person buying the security from him. . . .

S.C.Code Ann. § 35–1–1490 (Supp.2003).[3]

In evaluating subsection (2) of this statute, our Supreme Court defined a person "who offers or sells a security" in *Biales v. Young*, 315 S.C. 166, 432 S.E.2d 482 (1993). The *Biales* court expressly adopted the "financial benefits test" articulated by the United States Supreme Court in *Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), interpreting a federal law comparable to subsection (1).[4] The Court held that a person "who offers or sells a security" within the meaning of the Securities Act "is not limited to the owner who passes title"; however, to come within the definition, "a

---

3. Gordon was allowed to amend his complaint to conform with the evidence at the conclusion of trial to include an action under both section 35–1–1490(1) and (2). In the final order, the trial court found Gordon was entitled to recover from Drews for a violation of section 35–1–1490(1). However, the court went on to hold that Gordon could not prevail under subsection (2) because Drews met his burden of showing he could not have known of the untruth of his statements. Accordingly, we evaluate the trial court's order as applied to subsection (1).

4. The *Pinter* Court limited its holding to Section 12(1) of the Securities Act, codified at 15 U.S.C.A. § 77 *l* (1981), holding "this case does not present, nor do we take a position on, the scope of a statutory seller for the purposes of [Section] 12(2)." *Pinter*, 486 U.S. at 642 n. 20, 108 S.Ct. at 2076 n. 20, 100 L.Ed.2d at 679 n. 20. Although many state courts, including South Carolina, have adopted the *Pinter* "financial benefits test" as applicable to their state statutes comparable to Section 12(2), some have refused to extend the definition of seller and have instead adopted a "substantial factor test." *See, e.g., Hoffer v. State*, 113 Wash.2d 148, 776 P.2d 963, 964–65 (1989) (refusing to extend the *Pinter* test to subsection (2) of the state statute and maintaining the "substantial factor test" to evaluate that section as previously adopted by the court).

nonowner must (1) solicit the purchase, and (2) be motivated at least in part by a desire to serve his own financial interest or that of the owner of the security." *Biales,* 315 S.C. at 169, 432 S.E.2d at 484–85. In *Biales,* the Court found that an escrow agent, who had disbursed funds arising from the purchase of securities in property to his client, did not offer, solicit an offer, or pass title to an alleged security within the meaning of the Securities Act where the agent had not "persuaded or urged" the creditor to purchase the securities in the property. *Id.* at 170, 432 S.E.2d at 485. The Court went on to adopt the *Pinter* definition as applicable to the entire statute. *Id.* ("We, therefore, adopt the *Pinter* definition of a person "who offers or sells a security" as applicable to section 35–1–1490.").

We are convinced by the evidence in the record that Drews actively solicited—that is, persuaded or urged—Gordon to purchase shares in Builders Supply. Drews admitted he met with Gordon at Drews' office to discuss investing in Builders Supply, at which time Drews provided Gordon with promotional materials he had prepared. Beasley testified that Drews' "specific and total job" was to raise capital for the new business. He also testified that: "Frank Gordon was told by the two principal stockholders of Builders Station, Raymond Beasley and R.R. Drews, that financing was in place, and the SBA loan had been procured, in the bag . . . awaiting final signings."

We also find sufficient evidence to conclude Drews' solicitation of Gordon was motivated at least in part by a desire to serve his own financial interests and that of his fellow shareholders, thus satisfying the second prong of the *Biales/Pinter* test. It can hardly be disputed that the success of the Builders Supply venture depended on the ability of Beasley and Drews to raise sufficient capital. Therefore, they had a direct financial incentive to market and sell shares in the new company.

Accordingly, we find no error with the trial court's finding Drews was liable for the illegal sale of stock.

## II. Release and Settlement Agreement

 Drews next argues the trial court erred in finding Gordon was not bound by the Release and Settlement Agree-

ment executed by a majority of the Builders Station board members. We disagree.

It is undisputed that Gordon did not sign the agreement. Drews, however, contends the release was binding against Gordon even though he did not sign it because he "accepted the benefits of the release."

Drews argues this result is mandated by our Supreme Court's holding in *Watson v. Coxe Bros. Lumber Co.*, 203 S.C. 125, 26 S.E.2d 401 (1943). We find this case inapposite. *Watson* involved an employee of the lumber company that had been injured on the job. When the employee brought suit against the company for damages, the company claimed it had been released from liability when it paid the employee an agreed-upon settlement. The Court held that the employee must return the settlement payment before suing on the underlying action. *Id.* at 135, 26 S.E.2d at 404.

Unlike the injured employee in *Watson,* Gordon did not enter into an agreement to receive any compensation or other benefit in exchange for Drews' resignation. The "benefit" Drews claims Gordon allegedly received was "an incremental increase in [his] percentage of stock in relation to the outstanding number of shares." Again, unlike *Watson,* this "benefit" was not bargained for by Gordon, nor was Gordon capable of returning this "benefit" to the company since the change in his percentage ownership was merely incidental to the fixed number of shares he had purchased.

Furthermore, any claim that Gordon impliedly "ratified" the agreement without signing it is equally without merit. The record reflects that, at the board of directors meeting during which the settlement agreement was presented and signed, Gordon specifically asked Builders Supply's corporate attorney whether he would be bound by the agreement if he did not sign. He was told he would not be so bound.

For these reasons, we find the trial court correctly ruled Gordon was not bound by the Release and Settlement Agreement.

### III. Laches

Drews also asserts Gordon's claims are barred by laches. We disagree.

"Laches" is defined as "neglect for an unreasonable and unexplained length of time, under circumstances affording opportunity for diligence, to do what in law should have been done." *Muir v. C.R. Bard, Inc.*, 336 S.C. 266, 296, 519 S.E.2d 583, 598 (Ct.App.1999); *Treadaway v. Smith*, 325 S.C. 367, 378, 479 S.E.2d 849, 855–56 (Ct.App.1996). "Delay alone is not enough to constitute laches; it must be unreasonable, and the party asserting laches must show prejudice." *Brown v. Butler*, 347 S.C. 259, 265, 554 S.E.2d 431, 434 (Ct.App.2001); *Hallums v. Hallums*, 296 S.C. 195, 371 S.E.2d 525 (1988).

Parties seeking recovery under section 35–1–1490 must tender their securities before recovering the consideration paid for the shares. S.C.Code Ann. § 35–1–1490 (Supp.2003). Gordon tendered his shares during the trial. Drews asserts Gordon's claims are barred by laches because he tendered his securities more than four years after Builders Supply ceased business operations.

Section 35–1–1510, however, provides: "Any tender specified in Section 35–1–1490 may be made at any time before entry of judgment." S.C.Code Ann. § 35–1–1510 (Supp.2003). Gordon, therefore, tendered his shares within the statutorily prescribed time limit. Accordingly, we will not apply the equitable doctrine of laches in a manner that would subvert this explicit statutory provision.

Moreover, we discern no prejudice to Drews due to Gordon's delay in tendering his shares. Gordon filed his initial complaint over one and one-half years before the action went to trial. Drews had no reason to believe Gordon would not tender his shares within the time period allowed by statute.

We conclude the trial court was correct to deny Drews' request to dismiss Gordon's claims as barred by laches.

### IV. Attorney's Fees

Lastly, Drews argues the trial court's award of $42,693.50 in attorney's fees to Gordon was unreasonable. We disagree.

As a general rule, the amount of attorneys fees to be awarded in a particular case is within the discretion of the

trial judge. *Baron Data Sys., Inc. v. Loter,* 297 S.C. 382, 385–86, 377 S.E.2d 296, 298 (1989). The award, however, must be reasonable. *Id.*

There are six factors for the trial court to consider when determining an award of attorneys fees: (1) the nature, extent, and difficulty of the case; (2) the time necessarily devoted to the case; (3) professional standing of counsel; (4) contingency of compensation; (5) beneficial results obtained; and (6) customary legal fees for similar services. *Jackson v. Speed,* 326 S.C. 289, 308, 486 S.E.2d 750, 760 (1997). Upon request for attorneys fees that are authorized by contract or statute, the trial court should make specific findings of fact on the record for each of these factors. *See Jackson,* 326 S.C. at 308, 486 S.E.2d at 760 (holding that, "on appeal, an award for attorney's fees will be affirmed so long as sufficient evidence in the record supports each factor"); *Blumberg v. Nealco, Inc.,* 310 S.C. 492, 494, 427 S.E.2d 659, 661 (1993) (holding that the "court should make specific findings of fact on the record for each factor").

In the present case, the trial court entered specific findings for each of the required factors outlined in the case law. These findings are sustained by the evidence in the record. Thus, the award is affirmed.

## CONCLUSION

We find the trial court properly found Drews liable for the illegal sale of an unregistered security under the Securities Act, and that Drews failed to prove his entitlement to the limited offering exemption under the Act. Also, for the reasons stated above, Drews' other claims and defenses are without merit. The trial court's rulings are therefore

**AFFIRMED.**

GOOLSBY and ANDERSON, JJ., concur.