619 S.E.2d 437

**James T. COWBURN, Appellant,**

**v.**

**Andrew P. LEVENTIS, Jr. and Fidelity National Bank, Respondents.**

**No. 3990.**

Court of Appeals of South Carolina.

Heard Feb. 9, 2005.

Decided May 16, 2005.

Rehearing Denied Aug. 29, 2005.

22

Joe Mooneyham, of Greenville, for Appellant.

Donald R. Moorhead, Mason A. Goldsmith and John L.B. Kehl, all of Greenville and James Timothy White and P. Jay Pontrelli, both of Atlanta, GA, for Respondents.

HEARN, C.J.:

James Cowburn brought several causes of action against Andrew Leventis and Fidelity National Bank related to his investment in a Ponzi scheme.[1] Both Leventis and Fidelity made motions for summary judgment, which the trial court granted. We affirm in part, reverse in part, and remand.

## FACTS

James Cowburn contributed financially to a series of investments collectively known as the "Cash 4 Titles Program" (the Program). The Program, as it was described to Cowburn, engaged in the business of issuing short-term, high interest rate notes and bonds for the purpose of funding the automobile title lending industry. Cowburn first learned of the Program from a former co-worker, Clyde Matkin. Matkin then referred Cowburn to Andrew Leventis, an attorney who Matkin stated could get him into the Program. During Cowburn's meeting with Leventis, Leventis provided further details about the Program. Subsequently, Leventis arranged to

---

1. Black's Law Dictionary (8th ed. 2004) defines a Ponzi scheme as "[a] fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors, whose example attracts even larger investments."

accompany Cowburn on a trip to Atlanta to meet with Michael Gause, a principal in the Program. Cowburn alleges he decided to invest in the Program based on his conversations with Leventis and Gause.

Cowburn used money from his individual retirement account (IRA) to invest in the Program. According to Cowburn, Leventis informed him that Gause chose Fidelity National Bank as the conduit through which investors could contribute to the Program. Cowburn opened a self-directed individual retirement account (SDIRA) with Fidelity and transferred money from his other accounts into this SDIRA. Cowburn then completed the necessary paperwork to enable Fidelity to invest the money from his SDIRA into various notes and bonds connected with the Program. Specifically, Cowburn's investments consisted of: (1) a 270-day promissory note from Bellwether Holdings for $150,000, dated September 1, 1998; (2) a 270-day promissory note from Bellwether holdings for $100,227, dated October 1, 1998; (3) a seven-year bond from Southwestern Holdings for $318,000, issued on February 1, 1999; (4) a seven-year bond from Southwestern Holdings for $12,000, issued on April 1, 1999; (5) a seven-year bond from Southwestern Holdings for $14,000, issued on June 1, 1999; (6) a 270-day promissory note from Southern Title Holdings for $15,000, dated August 1, 1999; and (7) a 270-day promissory note from Southern Title Holdings for $43,000, dated September 1, 1999.

The Program initially performed as expected, and Cowburn received the interest payments he anticipated. However, in October of 1999, Cowburn received a call from Leventis informing him that his money was gone. Leventis informed Cowburn the Program was actually an illegal Ponzi scheme and that Gause had been arrested in connection with it.

Cowburn filed suit against both Leventis and Fidelity, alleging the following causes of action: (1) legal negligence against Leventis; (2) breach of fiduciary duty against Leventis and Fidelity; (3) violation of the South Carolina Uniform Securities Act against Leventis and Fidelity; (4) violation of the South Carolina Unfair Trade Practices Act against Leventis; (5) fraud against Leventis and Fidelity; (6) negligence against Fidelity; and (7) civil conspiracy against Leventis and Fideli-

ty. Leventis and Fidelity filed motions for summary judgment. The trial court issued an order granting both Leventis's and Fidelity's motions. Cowburn appeals.

## STANDARD OF REVIEW

In reviewing a motion for summary judgment, the appellate court applies the same standard of review as the trial court under Rule 56(c), SCRCP. *Trousdell v. Cannon,* 351 S.C. 636, 639, 572 S.E.2d 264, 265 (2002). Pursuant to Rule 56(c), SCRCP, summary judgment may be affirmed if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Id.* "On appeal from summary judgment, the reviewing court must consider the facts and inferences in the light most favorable to the nonmoving party." *Cantrell v. Green,* 302 S.C. 557, 559, 397 S.E.2d 777, 778 (Ct.App.1990).

## LAW/ANALYSIS

**I. Whether the trial court erred in granting summary judgment to Leventis?**

**a. Violation of the South Carolina Securities Act**

Cowburn argues the trial court erred in finding there was no material issue of fact concerning his allegation that Leventis violated sections of the South Carolina Uniform Securities Act (the Act). We agree.

Initially, in order to determine whether the act was triggered, we must decide whether the investments made by Cowburn are securities. Section 35–1–20(15) of the South Carolina Code (Supp.2004) provides the definition of "security" as "any note, stock, treasury stock, bond, debenture, [or] evidence of indebtedness, . . . ." Cowburn's investments, as indicated on the statements he received from Fidelity, consisted of promissory notes and bonds. Therefore, Cowburn's investments in the Program were securities pursuant to the Act. *See McGaha v. Mosley,* 283 S.C. 268, 273, 322 S.E.2d 461, 464 (Ct.App.1984) ("An instrument may be included within any of the Act's definitions of a 'security,' if on its face it answers to the name or description contained therein.").

■ Because the investments were securities, the next issue we must resolve is whether Leventis's sale of those securities gave rise to a cause of action under the Act. "The South Carolina Uniform Securities Act ... created public enforcement provisions as well as private civil remedies which are compensatory in nature. The Act authorizes the state Securities Commissioner to enforce its provisions, while giving private plaintiffs a limited civil right of action for securities fraud." *Atlanta Skin Cancer Clinic, P.C. v. Hallmark Gen. Partners, Inc.*, 320 S.C. 113, 116–17, 463 S.E.2d 600, 602 (1995). Section 35–1–1490 provides a private right of action for buyers of securities against "[a]ny person who ... offers or sells a security in violation of ... Section 35–1–410 or Section 35–1–810...."[2] Cowburn argues the trial judge erred in granting summary judgment to Leventis because genuine issues of material fact existed as to whether Leventis violated the Act. Specifically, Cowburn asserts that (1) the securities were not registered pursuant to section 35–1–810, and (2) Leventis failed to register as a broker-dealer in violation of section 35–1–410. We agree.

Section 35–1–810 states: "It is unlawful for any person to offer or sell any security in this State unless (a) it is registered under this chapter, (b) the security or transaction is exempted under Section 35–1–310 or 35–1–320...." Leventis argues he did not act in violation of section 35–1–810 because (1) he did not offer to sell the securities, and (2) the securities were exempt under sections 35–1–310 and –320.

An "offer to sell" securities is defined in section 35–1–20(13)(b) as "every attempt or offer to dispose of, or solicitation of an offer to buy, a security interest in a security for value." In this case, Leventis's role in the Program went beyond simply recommending an investment to a friend; rather Leventis played an integral role in the Program. Leventis

---

2. Section 35–1–1490 states that any person buying a security from someone acting in violation of sections 35–1–410 or –810 may "recover the consideration paid for the security, together with interest at six percent per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six percent per year from the date of disposition."

introduced investors, such as Cowburn and Matkin, to the Program. In his deposition, Leventis stated he referred people to the Program and received a referral fee for doing so. Leventis confirmed he referred approximately twenty people to the Program. Leventis told potential investors about the Program and provided written information to them regarding the Program. Leventis persuaded potential investors to contribute to the program by telling them about other investors, including him and his mother, and their contributions. He also arranged trips for potential investors to meet with Gause and other principals of the Program. After individuals decided to invest in the Program, Leventis assisted them in making their investment by providing them with forms and information about how to set up a SDIRA. He even went further in some cases by filling out the forms for investors and assisting them with transactions. Additionally, Cowburn testified he viewed Leventis as selling the investments purchased under the Program. Thus, we find a genuine issue of material fact exists as to whether Leventis offered to sell securities.

Further, we find there is a genuine issue of material fact as to whether the securities were exempt under sections 35–1–310 and –320. Section 35–1–310(9) exempts short-term commercial paper from the registration requirements of section 35–1–810, stating:

> Any commercial paper which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions and which evidences an obligation to pay cash within nine months of the date of issuance ... or any renewal of such paper which is likewise limited, or any guarantee of such paper or of any such renewal....

In this case, Cowburn's initial investment consisted of short-term commercial paper exempted under section 35–1–310(9) because it was an investment in 270–day promissory notes,[3] which were obligated to be paid within nine months.

However, Cowburn's subsequent investments were funded in part by the redemption proceeds on those short-term notes and included several seven-year bonds. Leventis asserts that

---

**3.** Black's Law Dictionary (8th 2004) defines "commercial paper" to include "a short-term unsecured promissory note, usu. issued and sold by one company to meet another company's immediate cash needs."

these transactions were similarly exempted from the securities registration requirement of section 35–1–810 because they were "rollover" transactions. Section 35–1–320(11) provides that "[a]ny transaction pursuant to an offer to existing security holders of the issuer, including persons who at the time of the transaction are holders of convertible securities, [is an exempt transaction], if (a) no commission or other remuneration, other than a standby commission, is paid or given directly or indirectly for soliciting any security holder in this State or (b) the issuer first files a notice specifying the terms of the offer and the securities commissioner does not ... disallow the exemption...."

In the present case, Cowburn did not invest with the same issuer for each transaction. His initial investments were with Bellwether Holdings, but subsequent transactions included investments with Southwestern Holdings. Further, Leventis's and Priority Advisors' tax returns reflect income from "referral fees" for the years 1998 and 1999 respectively. Because a material issue of fact exists as to whether the securities were exempt, the trial judge erred in granting summary judgment in favor of Leventis on Cowburn's allegation that he violated section 35–1–810 of the Act. *See Gordon v. Drews*, 358 S.C. 598, 606, 595 S.E.2d 864, 868 (Ct.App.2004) (stating that exemptions from the Act must be narrowly construed to protect investors); *Cantrell v. Green*, 302 S.C. 557, 559, 397 S.E.2d 777, 778 (Ct.App.1990) (stating that in reviewing a grant of summary judgment, a reviewing court must consider the facts and inferences in the light most favorable to the nonmoving party).

Moreover, we also find a genuine issue of material fact with respect to Cowburn's allegation that Leventis failed to register as a broker-dealer in violation of section 35–1–410. Section 35–1–410 states: "It is unlawful for any person to transact business in this State as a broker-dealer or agent unless he is registered under this chapter or exempt from licensing under this chapter." Section 35–1–20 defines a "broker-dealer" as "any person engaged in the business of effecting transactions in securities for the account of others or for his own account" and an "agent" as "any individual, other than a broker-dealer, who represents a broker-dealer or issuer in effecting or attempting to effect purchases or sales of securities."

As set forth above, the evidence indicates that Leventis played an essential role in marketing and referring investors to the Program. Leventis also provided investors with forms to set up a SDIRA with Fidelity, and in some cases, completed the forms for customers. In 1998, Leventis's tax return reflected over $120,000 in referral fees from the Program. In addition, Leventis was the sole owner of Priority Advisors, which he described as being in the business of referring people to the Program. In 1999, the tax return for Priority Advisors reflected $297,367 in income from referrals. Priority Advisors also received an ownership interest in Southwestern Holdings, one of the entities under the Program, without purchasing it. The subscription agreement for Southwestern Holdings indicates Leventis served as its marketing manager at the time Cowburn made his investment in Southwestern Holdings.

This evidence indicates Leventis may have been "effecting transactions in securities" when he referred Cowburn to the program. S.C.Code Ann. § 35–1–20(2) and (3). Thus, evidence exists that Leventis acted as a broker-dealer or agent of Priority Advisors and Southwestern Holdings pursuant to section 35–1–20 of the South Carolina Code.

Leventis does not dispute that he was not registered as a broker-dealer or agent. Rather, Leventis argues even if he were a broker-dealer or agent, he was exempt from the registration requirement.

Leventis argues he was exempt from registering as a broker-dealer because the securities he dealt with were exempted securities pursuant to S.C.Code Ann. § 35–1–310(9) (providing that short-term commercial paper is a security exempt from the registration requirement of S.C.Code Ann. § 35–1–810). Section 35–1–415(3)(b) provides that agents acting for an issuer effecting transactions in securities that are exempt from registering under 35–1–310(9) are exempt from the registration requirements of section 35–1–410.

As stated above, we find there is a genuine issue of material fact as to whether the securities were exempt securities. Likewise, we find a genuine issue of material fact as to whether Leventis was exempt from registering as an agent of an issuer based on section 35–1–415(3)(b).

Leventis further asserts that South Carolina Attorney General Order Number 97003 exempts him from registration as an agent because it permits an officer or director of Southwestern to make sales of securities without registration. The relevant section of Order Number 97003 reads as follows:

No principal, partner, officer, or director of an issuer offering its securities under a South Carolina registration, shall engage in the sale of securities in South Carolina without a Sales Permit or registration as a securities agent. Sales Permits will be deemed to have been issued unless notification of disallowance is provided to the issuer by the Securities Commissioner *following at least thirty (30) days prior notice to the Office of the Securities Commissioner, filed in duplicate with a return envelope, of the names and corporate titles of each principal, partner, officer and director of the issuer along with a signed statement from each of the individuals selling the securities indicating they: (1) perform or are intended to perform substantial duties for or on behalf of the issuer otherwise than in connection with transactions in securities and (2) will not be compensated in connection with their participation by payment of commissions or other remuneration based either directly or indirectly on transactions in securities.*

(emphasis added).

▉▉▉ Nothing in the record, including the cover letter provided by the Attorney General, suggests that Leventis met the requirements of Order Number 97003 by giving thirty days notice, along with a sworn statement that he would perform duties "other than in connection with transactions in securities" or that he would not be compensated for his participation. We find genuine issues of fact exist as to whether Order Number 97003 exempts Leventis from registration as a broker-dealer or agent. *See Gordon,* 358 S.C. at 606, 595 S.E.2d at 868; *Cantrell,* 302 S.C. at 559, 397 S.E.2d at 778. Therefore, we reverse the trial court's grant of summary judgment as to Cowburn's private cause of action under section 35–1–410.[4]

---

4. Leventis also argues that he was exempt from registration because as president of Priority Advisors, Inc., a company operating as director of Southwestern Holdings, he was not required to register by virtue of

## b. Fraud

Cowburn asserts the trial court erred in determining no genuine issue of material fact existed to show Leventis defrauded him. We disagree.

In order to establish a claim for fraud, a plaintiff must establish the following elements: "a representation; its falsity; its materiality; knowledge of its falsity or a reckless disregard of its truth or falsity; intent that the representation be acted upon; hearers ignorance of its falsity; hearers reliance on its truth; hearers right to rely; and hearers consequent and proximate injury." *First State Sav. Loan v. Phelps*, 299 S.C. 441, 446–47, 385 S.E.2d 821, 824 (1989). "Each and every one of these elements must be proven by clear, cogent, and convincing evidence." *Regions Bank v. Schmauch*, 354 S.C. 648, 672, 582 S.E.2d 432, 445 (Ct.App. 2003).

First, Cowburn asserts Leventis misrepresented the status of the bonds issued by two of the entities affiliated with the program, Southwestern Holdings and Southwestern Title Holdings. However, Cowburn fails to specify the misrepresentation. In addition, Cowburn fails to assert evidence of the other necessary elements in order to establish his claim for fraud. Because Cowburn did not assert a representation or any of the other required elements of fraud, we find no genuine issue of material fact with regard to this claim.

Southwestern's "Regulation D" filing, which exempts the company from registering its securities. *See* 17 C.F.R. §§ 230.501 to 230.508 (2004). This issue was not argued to the trial court in Leventis's motion for summary judgment or at the hearing on the motion.

This court may review additional sustaining grounds raised by a respondent, and "if convinced it is proper and fair to do so, rely on them or any other reason" raised on appeal and appearing in the record to affirm the lower court's judgment. *I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 420, 526 S.E.2d 716, 723 (2000). In this case, we decline to review this potential additional sustaining ground because we are not convinced it is proper and fair to do so. This particular issue implicates complex state and federal securities law, which were summarily addressed by Leventis in his brief on appeal. *See also Gordon*, 358 S.C. at 606, 595 S.E.2d at 868; *Cantrell*, 302 S.C. at 559, 397 S.E.2d at 778.

The only other misrepresentation asserted by Cowburn was Leventis's statement that his mother invested $50,000 in the Program. Cowburn contends this statement is contradictory to a statement Leventis made at his deposition that he invested only $30,000 of his mothers money in the Program. We agree with the trial courts determination that Cowburn neither presented evidence of the falsity of Leventis's statement nor established that it was material to his decision to invest in the Program. In addition, Cowburn did not present evidence of Leventis's intent for him to rely on the statement. Therefore, we find the trial court properly granted summary judgment to Leventis on this issue.

### c. Breach of Fiduciary Duty

Cowburn argues there was a material issue of fact regarding his claim that Leventis owed him a fiduciary duty, violated that duty, and acted negligently.[5] Cowburn maintains Leventis's duties to him arose because Leventis acted as a seller of securities, and Leventis breached this duty by failing to investigate investments under the Program. We disagree.

The determination of whether a fiduciary relationship exists is an equitable issue to be determined by the court. *Hendricks v. Clemson Univ.*, 353 S.C. 449, 458, 578 S.E.2d 711, 715 (2003). "A fiduciary relationship exists when one reposes special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing confidence." *O'Shea v. Lesser*, 308 S.C. 10, 15, 416 S.E.2d 629, 631 (1992). Moreover, the evidence must show the entrusted party "actually accepted or induced the confidence placed in him." *State v. Parris*, 353 S.C. 582, 593, 578 S.E.2d 736, 742 (Ct.App.2003) (quoting *Brown v. Pearson*, 326 S.C. 409, 423, 483 S.E.2d 477, 484 (Ct.App.1997)).

A broker or dealer of securities is an agent of the buyer, and therefore, generally owes the buyer fiduciary duties. These duties often include the duty to account for all funds and property belonging to the buyer, to refrain from

---

5. Although ·Cowburn asserted a cause of action for legal negligence/malpractice, that issue was abandoned at the hearing on summary judgment.

acting adversely to the buyers interest, to avoid engaging in fraudulent conduct, and to communicate any information he or she may acquire that would be to the buyers advantage. *See* 12 Am. Jur. 2d *Brokers* 109 (1997). However, Cowburn has not cited any case that imposes a fiduciary duty upon a broker to investigate for any unknown potential risks of investment. *Cf.,* 12 Am.Jur.2d *Brokers* 128 (1997) (asserting that a loan broker, who has agreed to find a specific type and quality loan for the customer, has a duty to conduct a reasonable investigation to ensure the loans were of that specific type and quality); *Regions Bank v. Schmauch,* 354 S.C. 648, 671, 582 S.E.2d 432, 444 (Ct.App.2003) (stating that bank may be held to a fiduciary duty to disclose material facts if it undertakes to advise); *Moore v. Moore,* 360 S.C. 241, 251, 599 S.E.2d 467, 472 (Ct.App.2004) ("Parties in a fiduciary relationship must fully disclose to each other all *known* information that is significant and material, and when this duty to disclose is triggered, silence may constitute fraud." (emphasis added)); *Eaddy v. Dorn,* 289 S.C. 356, 359, 345 S.E.2d 513, 514–15 (Ct.App.1986) (finding term "broker" included any person hired to conduct an auction for a fee and reaffirming a broker's fiduciary duty to keep its principal "fully and promptly informed of all material facts *that come to the broker's knowledge* with respect to the transaction in which the broker is engaged, affect the principal's interest, and might influence the principal's action." (emphasis added)); *Vacation Time of Hilton Head Island, Inc. v. Lighthouse Realty, Inc.,* 286 S.C. 261, 267–68, 332 S.E.2d 781, 785 (Ct.App.1985) ("A [real estate] broker owes a duty to its principal to keep it fully and promptly informed of all material facts *that come to the broker's knowledge* with respect to the transaction in which the broker is engaged, affect the principal's interest, and might influence the principal's action." (emphasis added)). *See also Jordan v. UBS AG,* 11 A.D.3d 283, 782 N.Y.S.2d 722 (App. Div. 1st Dep't 2004) (finding customer's allegation of breach of fiduciary duty against bond broker precluded by agreements between customer and broker in which customer acknowledged his own responsibility for making investment decisions and investigations). Therefore, we find the trial court properly granted summary judgment as to the breach of fiduciary duty cause of action.

#### d. Negligence

█ Cowburn also alleges an issue of material fact exists regarding whether Leventis acted negligently in failing to investigate the Program before recommending it to him. We disagree.

█ "Ordinarily, the common law imposes no duty on a person to act. Where an act is voluntarily undertaken, however, the actor assumes the duty to use due care." *Hendricks*, 353 S.C. at 456–57, 578 S.E.2d at 714 (citations omitted).

Here again, Cowburn cites no authority for the proposition that Leventis was under a duty to investigate, nor does the evidence indicate he undertook such a duty. The record indicates Leventis's role in the Program was to refer investors to the Program, and in that capacity, we do not find a duty to investigate. Therefore, the trial court acted appropriately in granting summary judgment on Cowburn's negligence cause of action.

#### II. Whether the trial court erred in granting summary judgment in favor of Fidelity?

#### a. Agency

█ Cowburn argues Fidelity established an agency relationship with Leventis by giving him apparent authority to act on its behalf. We disagree.

█ "The test to determine agency is whether or not the purported principal has the *right to control* the conduct of the alleged agent." *Fernander v. Thigpen*, 278 S.C. 140, 144, 293 S.E.2d 424, 426 (1982) (emphasis in original). "An agency relationship may be established by evidence of actual or apparent authority." *Charleston, S.C. Registry for Golf Tourism, Inc. v. Young Clement Rivers Tisdale, LLP*, 359 S.C. 635, 642, 598 S.E.2d 717, 721 (Ct.App.2004) (citation omitted). "The elements which must be proven to establish apparent agency are: (1) that the purported principal consciously or impliedly represented another to be his agent; (2) that there was a reliance upon the representation; and (3) that there was a change of position to the relying party's detriment." *Graves v. Serbin Farms, Inc.*, 306 S.C. 60, 62, 409 S.E.2d 769, 771 (1991) (citation omitted). "[A]n agency may not be established

solely by the declarations and conduct of an alleged agent." *Frasier v. Palmetto Homes of Florence, Inc.*, 323 S.C. 240, 245, 473 S.E.2d 865, 868 (Ct.App.1996) (citation omitted).

Cowburn contends Leventis's apparent authority is evidenced by Fidelity giving Leventis application packages for SDIRAs, forms, and business cards of Fidelity employees. In addition, Cowburn states Leventis bolstered his apparent agency by filling out the forms for investors and by dealing directly with Fidelity. We find these actions do not establish the elements necessary to form apparent authority. First, supplying forms and employee business cards to Leventis does not amount to a representation that Leventis was an agent of Fidelity nor suggest that Fidelity had the right to control Leventis. Second, given that supplying Leventis with forms and business cards was the only action taken by Fidelity to evidence apparent authority, this is not enough to produce reliance by Cowburn. Third, Cowburn does not argue how he relied on this action by Fidelity to his detriment. Furthermore, the actions by Leventis, which Cowburn asserts bolstered his perception of an agency relationship, should not be considered because they are actions by the purported agent, not the principal. *See id.* at 244–45, 473 S.E.2d at 868 ("Apparent authority to do an act is created as to a third person by written or spoken words *or any other conduct of the principal* which, reasonably interpreted, causes the third person to believe the principal consents to have the act done on his behalf by the person purporting to act for him." (emphasis in original)). Therefore, we find no genuine issue of material fact exists to support Cowburn's claim that Leventis was an agent of Fidelity.

### b. Affidavit

 Cowburn argues the trial court failed to consider the affidavit from his expert, Thomas Mason, in resolving the motion for summary judgment, asserting the affidavit creates an issue of material fact as to the duties Fidelity owed to Cowburn.[6] We find Cowburn did not preserve this issue for our review.

---

**6.** The affidavit does not contain any allegations concerning the duties owed by Leventis.

 In order for an issue to be preserved for appellate review, with few exceptions, it must be raised and ruled upon by the trial judge. *Lucas v. Rawl Family Ltd. Pship.*, 359 S.C. 505, 511, 598 S.E.2d 712, 715 (2004). When a trial court makes a general ruling on an issue, but does not address the specific argument raised by a party, that party must make a Rule 59(e) motion asking the trial court to rule on the issue in order to preserve it for appeal. *See Noisette v. Ismail*, 304 S.C. 56, 58, 403 S.E.2d 122, 124 (1991).

Leventis and Fidelity objected at the summary judgment motion hearing to Mason's affidavit on the grounds that it did not establish Mason as an expert, was not timely, was not notarized, and contained legal conclusions. Although the record includes discussions during the motion hearing concerning Mason's affidavit and Cowburn's assertions that it should be considered, the trial court never indicated whether it would consider it. In addition, the trial court did not specifically address Mason's affidavit in its written order granting summary judgment. We find the trial court did not rule upon this issue, and thus, whether or not the court erred in failing to consider the affidavit is not preserved for appeal. *See id.*

### c. Breach of Fiduciary Duty

 Cowburn argues a genuine issue of material fact existed as to whether Fidelity owed him a fiduciary duty and whether Fidelity breached that duty. We disagree.

 As stated previously: "A fiduciary relationship exists when one reposes special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing confidence." *O'Shea*, 308 S.C. at 15, 416 S.E.2d at 631 (citation omitted).

> The term fiduciary implies that one party is in a superior position to the other and that such a position enables him to exercise influence over one who reposes special trust and confidence in him. As a general rule, mere respect for another's judgment or trust in his character is usually not sufficient to establish such a relationship. The facts and circumstances must indicate that the one reposing the trust has foundation for his belief that the one giving advice or

presenting arguments is acting not in his own behalf, but in the interests of the other party.

*Burwell v. South Carolina Nat'l Bank,* 288 S.C. 34, 41, 340 S.E.2d 786, 790 (1986) (citations omitted).

Generally, a bank-depositor relationship establishes a creditor-debtor relationship rather than a fiduciary relationship. *Rush v. South Carolina Natl. Bank,* 288 S.C. 560, 562, 343 S.E.2d 667, 668 (Ct.App.1986).

In limited circumstances, however, a fiduciary relationship may be created between a bank and a customer if the bank undertakes to advise the customer as a part of the services the bank offers. Unless the funds are deposited into a special account or specifically designated to be kept separate, the relationship between a general depositor and the bank is that of creditor and debtor, and a trust is not created.

*Id.* (citations omitted).

In the instant case, we find no evidence Fidelity undertook to advise Cowburn about his investments. To the contrary, Fidelity's custodial agreement provides as follows:

**11.1 Hold Harmless.** You agree to hold us harmless, to indemnify, and to defend us against any and all claims arising from and liabilities incurred by reason of any action taken by us in good faith pursuant to this agreement.

**11.2 No Investment Discretion.** You agree that all contributions shall be invested according to your sole discretion. All investments in the IRA shall be in one or more of the following: (1) term investments of the Custodian; (2) Marketable securities (excluding securities issued by Custodian or any of its affiliates acquired through a current underwriting); and any other category or investment acceptable to the Custodian. *We shall not be responsible or liable for any investment decisions or recommendations with respect to the investment, reinvestment, or sale of assets in the custodial account. We shall not be responsible for reviewing any assets held in the custodial account and shall not be responsible for questioning any of your investment decisions. We shall not be responsible for any loss resulting from any failure to act because of the absence of direction from you.*

. . . .

**11.3 Transaction Responsibility.** We are not responsible for inquiring into the nature or amount of any contribution made by you, nor into the amount or timing of any distribution requested.

(emphasis added). This language in the custodial agreement specifically limits Fidelity's duties and emphasizes that Fidelity does not advise SDIRA customers on their investment decisions. Fidelity's counsel questioned Cowburn in his deposition about these provisions in the custodial agreement, and Cowburn indicated he understood them. Cowburn also stated he understood the contract limited Fidelity's duties, and that Fidelity was not responsible for reviewing his investments. Cowburn also testified he had invested in SDIRAs in the past. He stated he understood Fidelity's role to be that of a custodian, and that it was not Fidelity's role to provide him with investment advice. Cowburn confirmed he alone was responsible for his investment decisions.

Cowburn acknowledged Fidelity did not make any affirmative representations regarding whether he should make an investment and did not give him financial advice. However, Cowburn asserts a single statement made by a Fidelity employee, Loree Adams, amounted to Fidelity undertaking to advise him. Cowburn states this was the only statement made by a Fidelity employee that he considered a recommendation. In regard to his conversation with Adams about the Program, Cowburn testified:

I asked her for her opinion on this—this investment.

. . . .

She said, "Well,"—words to this effect, 'cause, you know, it's been three years ago; words to the effect, "I've been here two years, and these guys have never missed a payment, and they're always on time, and it seems good to me."

We find this statement does not amount to Fidelity undertaking to advise Cowburn as to his investments. The first part of the statement concerns only the timeliness of interest payments made by the Program. It does not offer any advice to Cowburn regarding the quality of his investment. In addition, the statement, "it seems good to me," does not amount to rendering advice such that Cowburn would rely on its authen-

ticity for purposes of imposing a fiduciary duty on a bank. *See Burwell,* 288 S.C. at 41, 340 S.E.2d at 790 (stating that mere respect for another's judgment or trust in her character is usually not sufficient to establish a fiduciary relationship). Neither has Cowburn presented any evidence that Adams knew he was placing her in a position of special trust. *Regions Bank v. Schmauch,* 354 S.C. 648, 671, 582 S.E.2d 432, 444 (Ct.App.2003) ("[N]o fiduciary relationship between a bank and its depositor exists when the bank is unaware of any special trust reposed in it.").

Cowburn also argues section 408 of the Internal Revenue Code (West 2005) equates IRAs to trusts, thereby making Fidelity a trustee and imposing fiduciary duties on Fidelity. We disagree with Cowburn's interpretation of this section.

Section 408 provides as follows:

(a) **Individual retirement account.**—For purposes of this section, the term "individual retirement account" means a trust created or organized in the United States for the exclusive benefit of an individual or his beneficiaries, but only if the written governing instrument creating the trust meets the following requirements:

. . . .

(h) **Custodial accounts.**—For purposes of this section, a custodial account shall be *treated as a trust* if the assets of such account are held by a bank (as defined in subsection (n)) or another person who demonstrates, to the satisfaction of the Secretary, that the manner in which he will administer the account will be consistent with the requirements of this section, and if the custodial account would, except for the fact that it is not a trust, constitute an individual retirement account described in subsection (a). For purposes of this title, in the case of a custodial account *treated as a trust* by reason of the preceding sentence, the custodian of such account shall be *treated as the trustee* thereof.

(emphasis added). Treasury Regulation 1.408–2 (West 2005) clarifies section 408 as follows:

(a) In general. An individual retirement account must be a trust or a custodial account (see paragraph (d) of this section).

. . . .

(b) Requirements. An individual retirement account *must be a trust* created or organized in the United States (as defined in section 7701(a)(9)) for the exclusive benefit of an individual or his beneficiaries. Such trust must be maintained at all times as a domestic trust in the United States. The instrument creating the trust must be in writing and the following requirements must be satisfied.

. . . .

(d) Custodial accounts. For purposes of this section and section 408(a), a custodial account is treated as a trust described in section 408(a) if such account satisfies the requirements of section 408(a) *except that it is not a trust* and if the assets of such account are held by a bank (as defined in section 401(d)(1) and the regulations thereunder) or such other person who satisfies the requirements of paragraph (b)(2)(ii) of this section. For purposes of this chapter, in the case of a custodial account treated as a trust by reason of the preceding sentence, the custodian of such account will be treated as the trustee thereof.

(emphasis added).

Our review of the plain language of the statute and the associated regulations persuades us to find that an IRA or custodial account is not a trust *per se,* but is treated as a trust for purposes of this particular provision of the Internal Revenue Code. In addition, we do not find section 408 imposes particular fiduciary duties on a custodian of an IRA. Therefore, we disagree with Cowburn that section 408 imposes fiduciary duties upon Fidelity sufficient to establish a breach of fiduciary duty claim.

Because we do not find evidence that Fidelity owed Cowburn a fiduciary duty under any of the theories asserted by Cowburn, the trial court properly granted summary judgment on this issue.

### d. Negligence

Cowburn asserts a genuine issue of material fact exists to establish his claim of negligence against Fidelity. He contends Fidelity's negligence arose out of the violation of its own polices and the terms of the custodial agreement.

46

■ In order to establish a claim for negligence, Cowburn must present evidence of a legal duty owed by Fidelity, a breach of that duty by a negligent act or omission, and damages that were proximately caused by that breach. *Andrade v. Johnson*, 356 S.C. 238, 245, 588 S.E.2d 588, 592 (2003). "The Court must determine, as a matter of law, whether the law recognizes a particular duty. An affirmative legal duty to act exists only if created by statute, contract, relationship, status, property interest, or some other special circumstance." *Charleston Dry Cleaners Laundry, Inc. v. Zurich Am. Ins. Co.*, 355 S.C. 614, 618, 586 S.E.2d 586, 588 (2003) (citations omitted).

■ First, Cowburn argues Fidelity breached its duties pursuant to the custodial agreement because Fidelity did not require him to purchase assets through its brokerage arm. We disagree with Cowburn's interpretation of this provision.

The provision referred to by Cowburn states: "Unless you give specific instructions to the contrary, we shall effect securities purchases or sales, *when possible,* through our affiliate, Fidelity National Capital Investors, Inc. at the brokerage commission rate charged for similar accounts." (emphasis added).

We find this provision does not impose a mandatory duty on Fidelity, but rather allows Fidelity to purchase securities through its brokerage arm, "when possible." In addition, Cowburn fails to argue how this alleged violation of the custodial agreement proximately caused his injury. Therefore, we find no factual issue exists with regard to this argument.

■ Second, Cowburn asserts Fidelity breached its duty to Cowburn by failing to keep adequate and complete records in accordance with Fidelity's internal policies and to annually determine the fair market value of his investments in accordance with its own internal policies and the requirements of the Internal Revenue Code. Further, Cowburn maintains if Fidelity had complied with its policies, and with section 408(i) of the Internal Revenue Code (West 2005), it would have discovered the Program was a Ponzi scheme.

Fidelity's internal policy states regulations require custodians of SDIRAs to report the fair market value of the IRA to the IRS and the IRA holder annually. The internal policy also provides if the IRA contains investments other than publicly traded securities, "the bank must ascertain that they are legitimate methods for determining the FMV [fair market value] available." Section 408(i) of the Internal Revenue Code provides:

(i) **Reports.**—The trustee of an individual retirement account and the issuer of an endowment contract described in subsection (b) or an individual retirement annuity shall make such reports regarding such account, contract, or annuity to the Secretary and to the individuals for whom the account, contract, or annuity is, or is to be, maintained with respect to contributions (and the years to which they relate), distributions aggregating $10 or more in any calendar year, and such other matters as the Secretary may require. The reports required by this subsection—

(1) shall be filed at such time and in such manner as the Secretary prescribes, and

(2) shall be furnished to individuals—

(A) not later than January 31 of the calendar year following the calendar year to which such reports relate, and

(B) in such manner as the Secretary prescribes.

Initially, Cowburn fails to argue what records were not kept by Fidelity, resulting in the breach of its duty to Cowburn. Next, the record on appeal includes semi-annual statements issued by Fidelity to Cowburn for the years in which he invested in the Program. These statements indicate the market value of his investments at the end of each reporting period as well as contributions and distributions made during the year. Therefore, these statements comply with Fidelity's internal policies and section 408(i). In addition, the custodial agreement states:

**Article XIII. Reports and Records.** We shall keep accurate and detailed records of all contributions, receipts, investments, distributions, disbursements, and other transactions relating to the custodial account. We shall provide reports to the IRS and to you as required by law and

regulations. *Unless you file a written statement with us within 60 days after you receive a statement, we shall be relieved and discharged from all liability to you (including your beneficiaries) with respect to all matters set forth in such report.*

(emphasis added). The record does not contain any indication that Cowburn alerted Fidelity to any discrepancies on the statements provided. Finally, Cowburn fails to assert how Fidelity breached its duty under its internal policies and section 408(i). Therefore, we find no factual dispute to be determined on this issue.

██ Third, Cowburn argues Fidelity had a legal duty to comply with the provisions of section 408 of the Internal Revenue Code. He asserts Fidelity breached this duty by allowing Cowburn to invest in non-qualified investments.

Section 408 does not contain a provision stating investments must be "qualified." However, section 408(a) sets forth requirements for IRAs. These requirements must be met in order for a taxpayer to benefit from the tax advantages of IRAs. One of these requirements prohibits investments in life insurance contracts, thereby limiting the type of investments available to a taxpayer. I.R.C. § 408(a)(3). Therefore, contrary to Cowburn's assertion, "qualified" does not mean Fidelity has an obligation to investigate the quality of the investments selected by Cowburn. Rather, Fidelity must ensure the Code does not specifically prohibit a type of investment. Because Cowburn failed to establish a duty pursuant to section 408 of the Internal Revenue Code, we find no genuine issue of material fact.

██ Fourth, Cowburn asserts Fidelity had a duty under the Anunzio–Wylie Anti–Money Laundering Act to report to him any of his funds sent to offshore banks. Other than a vague reference to the name of the Act, Cowburn cites no authority to support this assertion. Thus, we deem it abandoned on appeal. *See First Sav. Bank v. McLean,* 314 S.C. 361, 363, 444 S.E.2d 513, 514 (1994) (deeming an issue abandoned because the appellant failed to provide pertinent argument or supporting authority).

Fifth, Cowburn asserts Fidelity employees undertook a duty to advise him as to the quality of his investment, and there-

fore, owed him a duty of care in giving such advice. We disagree.

As previously discussed, in the custodial agreement Fidelity specifically limited its duty to advise Cowburn on his investments. We find no evidence in the record indicating any employees undertook the duty to advise Cowburn, nor any evidence of breach or causation. Because we find no genuine issue of material fact exists concerning Fidelity's purported negligence, the trial court properly granted summary judgment on this issue.

### e. Civil Conspiracy against Fidelity and Leventis

Cowburn argues Fidelity provided Leventis with the means of opening SDIRAs for victims of the Ponzi scheme, and the opening of those SDIRAs was essential to the scheme. Therefore, he alleges Fidelity and Leventis acted in a civil conspiracy, which contributed to Cowburn's injury. We disagree.

"It is well-settled in South Carolina that the tort of civil conspiracy contains three elements: (1) a combination of two or more persons; (2) for the purpose of injuring the plaintiff; (3) causing plaintiff special damage." *Kuznik v. Bees Ferry Assocs.*, 342 S.C. 579, 610, 538 S.E.2d 15, 31 (Ct.App.2000). "In order to establish a conspiracy, evidence, either direct or circumstantial, must be produced from which a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise." *First Union Natl. Bank of South Carolina v. Soden*, 333 S.C. 554, 575, 511 S.E.2d 372, 383 (Ct.App.1998).

The record does not contain any evidence that Fidelity and Leventis had an agreement, or that they joined together for the purpose of injuring Cowburn. Therefore, we find no genuine issue of material fact exists to establish a claim for civil conspiracy.

## CONCLUSION

We find Cowburn's argument that the trial court improperly disregarded his expert's affidavit is not preserved for our review. Furthermore, we affirm the trial court's grant of summary judgment as to Fidelity on all Cowburn's causes of

action. As to Cowburn's causes of action against Leventis, we find a genuine issue of material fact exists regarding his private cause of action for violations of S.C.Code Ann. § 35–1–410 and –810 (Supp.2003) and reverse the grant of summary judgment on those causes of action. As to Cowburn's remaining causes of action, we affirm the trial court's grant of summary judgment.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

GOOLSBY and WILLIAMS, JJ., concur.