19689

Moseley C. COLEMAN, Appellant, v. James D. DANIEL, II, et al., Respondents

(199 S. E. (2d) 74)

*William E. Jenkinson, Esq.,* of Kingstree, *for Appellant,* cites:

*Messrs. Connor and Connor,* of Kingstree, *for Respondent,* cite:

September 5, 1973.

LITTLEJOHN, Justice:

The plaintiff, Moseley C. Coleman, is the owner of two deficiency judgments procured May 30, 1966, against the defendant Linzie L. Rogers, and against his son, L. M. Rogers, known as Buddy Rogers. Coleman brings this action as a creditor of defendant Linzie Rogers, under South Carolina Code, § 57-301 (1962).

The complaint alleges that a deed dated October 26, 1964, to 198 acres of land, executed by Linzie Rogers to his daughter, Annie Margaret Rogers Daniel, and to her husband, James D. Daniel, II, both of whom are also defendants, was a fraudulent conveyance for the purpose of evading the payment of debts. This deed conveyed practically all of Linzie Roger's assets. The prayer for relief in the complaint was as follows:

"1. That said conveyance be adjudged and declared fraudulent and void and of none effect as to the judgments held by the plaintiff.

"2. That the tracts of land above described be adjudged to be subject to the liens of the plaintiff's judgments and that the same be foreclosed and satisfied by the sale of said lands by judicial sale as provided by law.

"3. That the judgments of the plaintiff and such other claims as may be adjudged as liens upon said tracts of land

be paid from the proceeds in the order of priority, and the balance to the defendants, L. L. Rogers, James D. Daniel and Annie Margaret R. Daniel, as the Court may direct.

"4. For such other and further relief as to the Court may seem just and proper."

The complaint does not ask that the deed be declared absolutely void as between the grantor and the grantee.

The action was tried before a special referee, who recommended that the court deny relief and dismiss the complaint. The plaintiff excepted to the referee's report; the circuit judge adopted the recommendations of the referee and dismissed the action. Coleman has appealed from that order. This case has been before this Court heretofore. See *Coleman v. Daniel et al.*, 253 S. C. 363, 170 S. E. (2d) 665. A related matter has also been before this Court.*

Coleman in his brief submits four questions to this Court, but we think that there is one basic question, the answer to which requires a reversal and thereby disposes of all issues. That question may be fairly stated as follows:

Did the trial judge err in holding, incident to the deed of October 26, 1964, that there was no fraudulent intent on the part of Linzie Rogers to defraud Coleman or other creditors, and that the intent of Linzie Rogers was not imputed to the grantees, who are his daughter and son-in-law?

The referee and the circuit judge found: (1) that the conveyance was for valuable consideration; (2) that Linzie Rogers did not intend to defraud Coleman or any other creditors; and (3) that any fraudulent intent was not imputed to the grantees.

---

* In *Daniels v. Coleman*, 253 S. C. 218, 169 S. E. (2d) 593 (1969), the same parties were before this Court concerning a $20,000.00 note, secured by a mortgage on the subject property of this action. The note was to be given to Coleman in return for clearing the debts of Linzie Rogers and for not bringing this action. The agreement was never finalized because of the inability of the parties to agree on comparatively minor details.

In many cases, we have held that the concurrent findings of the referee and of the trial judge will not be disturbed unless without evidentiary support, or unless contrary to the clear preponderance of the evidence. Cases collected, 3 South Carolina Digest, Appeal and Error, Key No. 1022 (1952, Supp. 1972). We have also held that in an equity case it is appropriate for this Court to make its own findings of fact. Cases collected, 3 South Carolina Digest, Appeal and Error, Key No. 987(3) and 990 (1952, Supp. 1972). Inasmuch as we conclude that the concurrent findings are against the clear preponderance of the evidence, we proceed to review the evidence and to make our own findings.

Linzie Rogers has lived on the subject premises all of his life. He has been physically disabled to actively carry on farming operations since 1926 and farmed the premises with the aid of sharecroppers until 1962. Linzie Rogers' son, Buddy, was formerly in the banking business. In 1962, he undertook to farm both the lands of his father and his own lands, which adjoined. Coleman financed the farming operations and took notes and mortgages on property owned by Buddy. On November 7, 1962, Linzie Rogers signed a note with Buddy for $21,023.51. On October 14, 1964 (12 days before the deed here involved), Linzie Rogers signed a note with Buddy for $6,847.00, payable to Coleman and due only 16 days later, on November 1, 1964 (4 days after the deed was executed).

It would appear that Buddy Rogers had three unprofitable farming years, and it is abundantly clear from the whole of the record that he was consistently in financial difficulties. Actions were brought against Linzie Rogers and Buddy Rogers to collect on the two notes, as well as other notes signed by Buddy Rogers only, and to foreclose mortgages executed by Buddy Rogers. On September 6, 1965, the property of Buddy Rogers was sold, under a mortgage foreclosure proceeding, for $57,000.00. On May 30, 1966, deficiency judgments against Buddy Rogers and Linzie Rogers

were granted because of the two notes co-signed by Linzie Rogers. The amounts were $26,306.52 and $8,627.02, respectively. Thereafter judgment was entered and execution returned *nulla bona*.

Annie Margaret Rogers Daniel and her husband, James D. Daniel, II, lived in Hemingway, some seven miles from the farm. Both are employed in the school system. They devoted considerable time and effort to the elderly Rogerses. On October 26, 1964, Linzie Rogers, along with his daughter and his son-in-law, went to the office of Attorney Whitlock in Lake City, about 25 miles from Hemingway. Linzie Rogers executed a deed in favor of his daughter and son-in-law, reciting as the consideration, "$5.00 love and affection, and subject to the lien of a mortgage held by Lake City Building & Loan Association", which was in the amount of $29,000.00. The grantees did not assume payment of the mortgage; however, they did pay the mortgage debt by refinancing it on November 18, 1964, through another lending institution, giving a new mortgage for $32,000.00. The Daniels submit that there was additional consideration not appearing on the face of the deed. It is contended that Linzie Rogers owed them, and others, about $10,000.00, which they assumed; and that they agree to pay him an additional $10,000.00 by way of future support at $1000.00 per year. In addition, it was agreed that Linzie Rogers and his wife could continue to live on the premises. We need not evaluate with exactness how much Linzie Rogers owed the Daniels and others, nor need we determine just what effect the agreement to provide future support has upon the case. Suffice it to say that the evidence, viewed most favorably to the Daniels, would indicate a maximum consideration of $49,000.00.

Counsel for Coleman argues: (1) that buying property "subject to a mortgage" does not obligate the grantee to pay the mortgage debt; (2) that the alleged past due indebtedness of $10,000.00 is not wholly, even if in part,

proven; and (3) that a promise to supply future support is not a valid consideration. We need not delicately weigh these arguments, because, even if each be rejected in favor of the defendants, the consideration still remains grossly inadequate.

Real estate appraisal witnesses for Coleman testified that the property involved was worth from $85,000.00 to $100,-000.00 in October, 1964. Linzie Rogers testified that he had, just prior to the execution of the deed, been offered $75,000.00 for the property. The referee and the trial judge accepted the $75,000.00 figure as being the true value. Using this figure, the property was conveyed for at least $26,000.00 less than its true value. We think, however, that both the referee and the trial judge erred in accepting the $75,000.00 figure as indicative of true value. The fact that someone offered to pay $75,000.00 bears little relation to what a willing seller would take and what a willing purchaser would give for the property. This is the usual test applied. It is, at most, evidence that the property was worth at least $75,000.00. We think that both the referee and the trial judge should have evaluated the property based on at least an $85,000.00 appraisal. This, of necessity, indicates that there was at least a $36,000.00 discrepancy between the maximum consideration and the minimum true value, and possibly as much as a $51,000.00 discrepancy. We need not factually find the exact value of the farm because, if it be $85,000.00 or $100,000.00, the consideration was still grossly inadequate.

Attorney Whitlock testified that at the time the deed was executed on October 26, 1964, no consideration was discussed or mentioned other than that which he inserted in the deed ($5.00, love and affection, and subject to mortgage). The defendants testified in essence that after the deed was executed and while they were enroute home, they decided to go by the office of a real estate dealer in Hemingway, 25 miles away from Whitlock's office, and execute an instrument. It reads as follows:

"WHEREAS, by separate instrument, the undersigned, L. L. Rogers has conveyed three (3) tracts of land in Williamsburg County, South Carolina, to his son-in-law, James D. Daniel, II, and his daughter Annie Margaret Rogers Daniel, for an expressed consideration of 'Five Dollars, love and affection, and subject to the lien of a mortgage then held by Lake City Building & Loan Association', and

"WHEREAS, other considerations, in addition to the consideration expressed, were in existence, namely: That over a period of several years, the said James D. Daniel II and Annie Margaret Rogers Daniel, had advanced to L. L. Rogers approximately Ten Thousand and No/100 ($10,-000.00) Dollars, and by this agreement the said James D. Daniel, II, and Annie Margaret Rogers Daniel promises to pay to the said L. L. Rogers and to his wife Maria H. Rogers an additional sum of TEN THOUSAND AND NO/100 ($10,000.00) DOLLARS, within ten (10) years from this date.

"To all of which the parties hereto bind themselves, their heirs, executors, administrators and assigns, this 26th day of October, 1964."

It was signed by Linzie Rogers, J. D. Daniel, II, and their wives.

On November 18, 1964, J. D. Daniel, II, and his wife executed the refinancing mortgage in the amount of 32,000-.00. On that date, Linzie Rogers went to the office of Attorney Whitlock and signed an affidavit as follows:

"PERSONALLY appeared before me L. L. Rogers who, being duly sworn, says that he has conveyed to his son-in-law and daughter, James D. Daniel II, and Annie Margaret Rogers Daniel, three (3) tracts of land for an expressed consideration of $5.00 and subject to the lien of a mortgage held by Lake City Building & Loan Association; that the mortgage held by said Lake City Building & Loan Association was for the original sum of $40,000.00, and the balance

now being $29,219.51; That the conveyance of said lands was made to my son-in-law and daughter in consideration of the balance due on said mortgage, and also in consideration of moneys advanced to me by my daughter and son-in-law over the past several years, amounting to approximately Ten Thousand and No/100 ($10,000.00) Dollars; that said conveyance was a bona fide, legal sale."

J. D. Daniel, II, testified that he was not aware of the fact that Mr. Rogers signed such an instrument. It is significant that the deed recited only the assumption of the mortgage, mentioning nothing about the assumption of debts or future payment of $10,000.00, and that at least some of the children of Linzie Rogers were not informed about the transaction.

Even though the defendants contend that the grantees were to supply the grantor and his wife with support, the record reflects that J. D. Daniel, II, drew a check to L. L. Rogers in the amount of $900.00 on November 18, 1964. On that same date, Linzie Rogers and his wife signed a demand note for $900.00 in favor of J. D. Daniel, II. Such is inconsistent with the contention that the Daniels were going to supply support to the Rogerses as a part of the consideration for the land conveyance.

It is apparent that Linzie Rogers, in the fall of 1964, had reached the point where he was insolvent in the sense that he could not pay his debts without liquidating his holdings. Both Linzie Rogers and J. D. Daniel, II, admit as much. On cross examination of Linzie Rogers, we find the following:

"Q. Had you reached the point where you couldn't pay your debts? Is that why you deeded it to your son Dan and daughter? Somebody had to take over and help you? You just couldn't pay your debts?

"A. That's right."

Linzie Rogers also admitted that Coleman had threatened to sue to foreclose before the deed was executed. Argument

that he thought Coleman was threatening to sue Buddy, only, is not convincing.

On cross examination, J. D. Daniel, II, testified as follows:

"Q. Well let me ask you this. Had he [Linzie Rogers] gotten to the point where he was having trouble paying his debts?

"A. He was having trouble paying his debts because I had lent him money from time to time and other members of the family had lent him money.

"Q. Well, he couldn't pay. Is that correct?
"A. That is correct.

"Q. Was that one of the reasons that he had to give the farm up?
"A. One of the reasons. But he also had a health problem. He couldn't farm on account of his health and he couldn't pay the payments at the savings and loan. Mrs. Rogers wanted him to sell so that they wouldn't have to make any more payments."

Fraud is seldom provable by direct evidence. More often, it must be proved by circumstantial evidence. In order to reach the conclusion that the conveyance on October 26, 1964, was not made in order to avoid a collection by Coleman, one must accept Linzie Rogers' statement at full value and disregard all of the undisputable circumstances which indicate to the contrary. His argument that he thought that he was being released from all obligations when he deeded 50 acres of land to Buddy on November 2, 1962, falls flat when it is realized that both of the notes involved came into being thereafter, one as recently as 12 days prior to the conveyance. It is sufficient to void the conveyance if it was made to defraud Coleman in the collection of either one of the two notes, or either one of the two deficiency judgments arising therefrom. Although it is inferable that Linzie Rogers was easily persuaded by his son Buddy to his own detri-

ment, there is no contention in the pleadings, or otherwise, that he was incompetent to sign the notes and to obligate himself. Indeed, a finding that he was incompetent at the time of the last note signing would imply that he was incompetent at the time of the conveyance. There is nothing in the record to indicate that his competence on October 14, 1964, was different from his competence on October 26, 1964.

Justice Bussey, in the case of *Jeffords v. Berry,* 247 S. C. 347, 147 S. E. (2d) 415 (1966), discussed fraudulent conveyance under South Carolina Code, § 57-301 (1962):

"Our courts, in interpreting this statute, have held that conveyances shall be set aside under two conditions: First, where the transfer is made by the grantor with the actual intent of defrauding his creditors where that intent is imputable to the grantee, even though there is a valuable consideration; and, second, where a transfer is made without actual intent to defraud the grantor's creditors, but without consideration. *Farmers' Bank v. Bradham,* 129 S. C. 270, 123 S. E. 835; *McInnis v. McRae,* 134 S. C. 162, 132 S. E. 473."

In *Gardner v. Kirven,* 184 S. C. 37, 191 S. E. 814 (1937), this Court held:

"Where transfers to members of the family are attacked either upon the ground of actual fraud or on account of their voluntary character, the law imposes the burden on the transferee to establish both a valuable consideration and the bona fides of the transaction by clear and convincing testimony."

Although the grantees assert that they were not aware of the fact that their father was liable to Mr. Coleman on the notes here involved, we think that they have failed to carry their burden of proof of showing the *bona fides* of the transaction by clear and convincing testimony.

What was said by this Court in *Dinkins v. Robbins,* 200 S. C. 475, 21 S. E. (2d) 10 (1942), appears to be very applicable here:

"Fraudulent intent in such instances can usually be shown only by a consideration of the attendant facts and circumstances, a resort to which must usually be had in order to distinguish between transactions which are bona fide, and those which are not. The Courts frequently must resort to evidence or circumstances which are not properly explained, when such circumstances lead to the belief that a fraudulent intent was present.

.     .     .     .     .     .

". . . [F]or fraud is not to be expected to seek the glare of day, or the presence of witnesses for its consummation. It is usually effected in secret, and it is only from circumstances, such as these, that we presume it."

Certain circumstances so frequently attend conveyances to defraud creditors that they are recognized and referred to as "badges of fraud". The badges tend to excite suspicions as to the *bona fides* of a challenged conveyance. Unexplained, they may warrant an inference of fraud. Whether the inference is warranted depends in large measure on whether a satisfactory explanation is presented.

"The facts which are recognized indicia of fraud are numerous, and no court could pretend to anticipate or catalog them all. Among the generally recognized badges of fraud are the insolvency or indebtedness of the transferor, lack of consideration for the conveyance, relationship between the transferor and the transferee, the pendency or threat of litigation, secrecy or concealment, departure from the usual method of business, the transfer of the debtor's entire estate, the reservation of benefit to the transferor, and the retention by the debtor of possession of the property.

"Although it has been said that a single badge of fraud may stamp a transaction as fraudulent, it is more generally held that while one circumstance recognized as a badge of

fraud may not alone prove fraud, where there is a concurrence of several such badges of fraud an inference of fraud may be warranted." 37 Am. Jur. (2d), Fraudulent Conveyances, § 10 (1968).

Practically all of the indicia of fraud enumerated above are present in this case, and we think the lower court erred in concluding factually that the conveyance was *bona fide* on the part of Linzie Rogers.

Under all of the circumstances, we think that the intent of Linzie Rogers was imputable to, the grantees.

It is their testimony that they were unaware of the fact that Linzie Rogers obligated himself on the two notes involved. Direct proof of knowledge is not always required in order to impute intent. There is no requirement that a grantee have knowledge of the specific debt to the creditor who brings the action to, set aside the transfer. *Means v. Feaster,* 4 S. C. 249 (1873).

The Daniels had been married for twenty years. The record indicates that their association with the parents was very close; the daughter testified . . . "I buy most of her clothes and things for the house that she needs; their medical bills; painting the house; roofing the house." . . . "Any needs that they had, we took care of." The antecedent consideration, established by the grantees, involved repeated loans from the Daniels to Linzie Rogers.

Actual knowledge of, or participation in, the debtor's fraudulent intention on the part of the transferee need not be established in order to justify a conclusion that the transaction was illegal. The transaction is subject to attack if at the same time of the transfer the transferee had notice of circumstances which would arouse the suspicion of an ordinarily prudent man and cause him to make inquiry as to the purpose for which the transfer was being made, which would disclose the fraudulent intent of the maker. *Hudnal v. Teasdall,* 1 McCord 227 (S. C.

1821). Knowledge on the part of a purchaser that the seller is indebted or insolvent has frequently been held sufficient to place a purchaser on notice and to require him to investigate. 37 Am. Jur. (2d), Fraudulent Conveyances, § 9 (1968).

As hereinabove discussed, the grantees had the burden of showing the *bona fides* of the transaction by clear and convincing testimony. If the Daniels did not know of Linzie Rogers' indebtedness to Coleman, we are of the opinion that they have failed to adequately explain their not making more detailed inquiry into the financial status of Linzie Rogers, when the circumstances demanded such and such inquiry would have most probably led to the discovery of the subject debts.

We therefore hold that the trial judge erred in dismissing the complaint and in failing to grant the relief sought by Coleman. The deed from Linzie Rogers to Annie Margaret Rogers Daniel and James D. Daniel, II, dated October 26, 1964, is void as to Coleman and the property described in the deed is therefore subject to the lien of Coleman's judgments. Coleman may seek an order of the lower court for sale of the property in satisfaction of his judgments unless the amounts due him be sooner paid.

Reversed and remanded.

Moss, C. J., and LEWIS and BRAILSFORD, JJ., concur.

BUSSEY, J., concurs and dissents.

BUSSEY, Justice (concurring and dissenting):

I agree that the judgment below should be reversed but not being in accord with much of the majority opinion, I set forth my views as to the appropriate disposition of this appeal.

At the outset, I should state that most of the material, concurrent findings of fact below are to my mind not against the clear preponderance of the evidence and should not be set aside. The special referee is an experienced attorney and a life long resident of the vicinage. He, of course, had oppor-

tunity to observe the witnesses, their demeanor, etc. and most likely some of them were known to him. His findings as to where the truth lay are entitled to great weight.

There was competent evidence, other than that mentioned in the majority opinion from which the referee logically concluded that the value of the property was $75,000 at the time of conveyance, but even if it was worth $85,000 to $100,000, as contended by Coleman, the evidence shows that as between the grantor and the Daniels there was no gross inadequacy of consideration from which any inference of fraud could be drawn. The uncontradicted evidence is that the Daniels became obligated to support Mr. and Mrs. L. L. Rogers for the balance of their lives and this obligation when added to the consideration paid contemporaneously with the transfer could well have exceeded the value of the land. As against Coleman, however, the agreement of the Daniels for the future support of Mr. and Mrs. Rogers was not a good consideration and is some evidence, under the circumstances, of fraudulent intent on the part of Mr. Rogers. *Matthews v. Matthews,* 207 S. C. 170, 35 S. E. (2d) 157.

It makes little, if any difference, however, under the facts of this case what the intent of Mr. Rogers was. The consideration paid by the Daniels contemporaneously with the transfer (by way of mortgage assumption, cancellation of the debts of Mr. Rogers, and payments of his debts or otherwise) has not been proved with precision but did not exceed approximately $40,000. Since future consideration was not good against Coleman, it follows that the conveyance was, in effect, a voluntary one to the extent that the value of the property exceeded the consideration contemporaneously paid by the grantees. Everyone concedes that the property was worth at least $75,000, with the result that there was a voluntary conveyance of the real property to the extent of at least $35,000, a sum quite adequate to pay the indebtedness to Coleman, and, hence, the conveyance was a legal fraud upon Coleman, regardless of the intent of any of the parties. If, as Coleman currently contends,

the property is worth approximately $100,000, its value is quite adequate to pay Coleman's indebtedness, interest and costs without depriving the Daniels of that for which they have paid most valuable and substantial consideration. Under these circumstances, it is not at all necessary to consider whether any fraudulent intent on the part of L. Rogers was imputable to the grantees, although I am of the view that the findings thereabout below are supported by the clear preponderance of the evidence.

Pertinent to the proper disposition of the present controversy is the following from 37 C. J. S. p. 984 Fraudulent Conveyances § 158:

"With respect to a partial insufficiency of the consideration of conveyances, there is an important difference between law and equity. At law a conveyance is wholly good or wholly bad. In equity, when the property is of greater value than the consideration, the conveyance may be impeached as being voluntary to a partial extent, and if there is no actual fraud on the part of the grantee, will be sustained to the extent of the consideration, but only to that extent."

South Carolina cases in accord with the foregoing principle include, *Davidson & Simpson v. Graves* (1831), 8 S. C. Eq. (Bailey) 268; *Brown v. McDonald* (1887), 10 S. C. Eq. (1 Hill) 297; *Parker v. Holmes,* 2 Hill Eq. 95; *Ferguson v. Harrison,* 41 S. C. 340, 19 S. E. 619; *Sternberger v. Summerford,* 150 S. C. 60, 147 S. E. 627; *Steinmeyer v. Steinmeyer,* 64 S. C. 413, 42 S. E. 184, 185.

The judgment below should be reversed but the cause remanded for the court to determine, as precisely as possible, the consideration actually paid or assumed by the grantees, approximately contemporaneously with the conveyance to them, excluding of course all obligation for the future support of Mr. and Mrs. L. L. Rogers. Unless the indebtedness to Coleman be otherwise paid, the property should then be sold and Coleman's indebtedness and costs paid to the extent that the sales price of the property exceeds the consid-

214

eration determined to have been actually paid or assumed by the grantees.