795 S.E.2d 857

Frank GORDON, Jr., Individually and as Trustee of Dorothy S. Gordon (Deceased) Trust, Respondent,

v.

Donald W. LANCASTER, Appellant.

Appellate Case No. 2014–001247
Published Opinion No. 5452

Court of Appeals of South Carolina.

Submitted June 1, 2016
Filed November 2, 2016
Rehearing Denied February 16, 2017

John Joseph Dodds, III, of The Law Firm of Cisa & Dodds, LLP, of Mt. Pleasant; and Stephen Peterson Groves, Sr., of Nexsen Pruet, LLC, of Charleston, for Appellant.

Stephanie D. Drawdy and Justin O'Toole Lucey, both of Justin O'Toole Lucey, PA, of Mount Pleasant, for Respondent.

SHORT, J.:

Donald W. Lancaster appeals an order awarding damages to Respondent Frank Gordon, Jr., Individually and as Trustee of the Dorothy S. Gordon (Deceased) Trust, in a lawsuit Gordon filed to collect on a prior judgment he obtained against Lancaster's uncle. On appeal, Lancaster argues the underlying judgment was no longer enforceable and challenges the findings that he and his uncle engaged in various fraudulent conveyances. We affirm.[1]

**FACTS AND PROCEDURAL HISTORY**

From 1946 until approximately 1992, Lancaster's maternal uncle, Rudolph Robert Drews, owned and operated "The Drews Company," a construction business in Charleston, South Carolina. During his high school and college years, Lancaster worked at The Drews Company and became close to both Drews and Drews's wife, Effie. According to Lancaster, The Drews Company suffered financially after Hurricane Hugo in 1989 as a result of the acts of an unscrupulous business associate who absconded with customer deposits for lucrative jobs. As a result of this misfortune, the Drewses began borrowing heavily on their home in an effort to raise revenue for their business. The situation worsened when the Internal Revenue Service (IRS) filed liens against Drews and his business. Drews sold what was left of his business to Dorsey Biller, who had been the General Manager of The Drews Company. The Drewses decided to sell their home to raise funds to pay the various IRS liens and outstanding loans associated with The Drews Company. Lancaster asserted the

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

Drewses had $100,000 "[a]fter appropriately paying off the IRS and satisfying other standing debts."[2]

In May 1992, at Drews's request, Lancaster used the $100,000 allegedly remaining from the sale of Drews's residence, along with $60,000 of his own funds to purchase 17 Bainbridge Drive, in Charleston, South Carolina. On May 22, 1992, Lancaster executed an agreement purporting to grant the Drewses a life estate in this property. The agreement was not a deed and was not recorded in the public records. It does not reference the $100,000 Drews gave to Lancaster to purchase the property, and it indicated the consideration for the conveyance of the life estate was "the sum of TEN ($10.00) AND NO/100S DOLLARS and love and affection for my uncle and aunt."

On June 12, 1992, Lancaster obtained a $40,000 open-ended mortgage on the Bainbridge Property. From 1993 to 1995, Lancaster paid Drews $40,000 in checks drawn from the bank from which the $40,000 line of credit was obtained, supposedly for the purpose of helping the Drewses pay their living expenses. Drews, however, paid the interest incurred on the line of credit, but did not sign any IOUs or notes of indebtedness for the disbursements. Lancaster maintained he used a spreadsheet to document payments by Drews on the loan and updated the entries contemporaneously with the corresponding events; however, Lancaster was unable to explain a discrepancy between the spreadsheet produced during his deposition and the one at trial.

In March 1995, Drews granted Lancaster a $40,000 mortgage on real property Drews owned at 1705 Meeting Street, Charleston, South Carolina. The mortgage was not recorded until November 1995. Drews did not execute a note on the mortgage, and Lancaster did not provide any contemporaneous consideration for it.

On April 27, 1995, Drews, as attorney-in-fact for Lancaster, signed an agreement to purchase a residence at 2 Nuffield Road, in Charleston, South Carolina. Lancaster claimed he and Drews agreed they would substitute a one-story house

---

**2.** Contrarily, the court noted that for the remainder of his life, Drews had "pending creditor claims, including IRS assessments and liens...."

chosen by the Drewses for the Bainbridge property because of medical problems with Drews's knees. Lancaster claimed he gave Drews a power of attorney to sign a sales contract on Lancaster's behalf; however, at trial, Lancaster could not find the document granting this authority, and no such document could be found in the public records. Mrs. Drews paid the $1,000 deposit on the home. On May 15, 1995, Lancaster increased the $40,000 line of credit to $79,250 and purchased the Nuffield property for $125,000 the following day. On May 17, 1995, Lancaster executed a "Memorandum of Lease and Subordination Agreement" for the Nuffield property that actually granted the Drewses a life tenancy in the property for consideration of $10.00 "and other good and valuable consideration." The document was recorded; however, it was titled as a "lease" rather than as a deed.

In 1996, Drews and his business partner, Raymond Beasley, opened a hardware store in Charleston. The store, known as Builders Station, was incorporated, and its board of directors approved a business plan and capital structure that provided for the sale of stock to outside investors. Gordon, one of the outside investors, purchased fifty shares of stock on September 9, 1996, for $50,000, on his mother's behalf and with her funds. The business failed and ultimately closed in 1997.

On April 15, 1998, Drews granted Lancaster a $100,000 mortgage on the Meeting Street property, again without executing a note and without contemporaneous consideration from Lancaster. The mortgage was filed on May 4, 1998. However, contrary to Lancaster's position at trial that this mortgage was intended to replace the $40,000 mortgage Drews granted Lancaster in March 1995, no satisfaction of the $40,000 mortgage was filed contemporaneously with the creation of the $100,000 mortgage.

In April 1999, Gordon, as attorney-in-fact for Dorothy Gordon, filed a lawsuit against Drews, claiming the sale of the stock in Builders Station was illegal and fraudulent under the Uniform Securities Act and also asserting claims for common-law misrepresentation and breach of fiduciary duty.

In July 1999, three months after Gordon filed his action against Drews, Drews granted Lancaster a $20,000 mortgage on the Meeting Street property. As with the two prior mort-

gages Drews gave to Lancaster on the same property, there was no contemporaneous consideration from Lancaster and no note.

On November 5 and 6, 2001, Lancaster executed satisfactions of the three mortgages on the Meeting Street property. By deed dated November 6, 2001, Drews conveyed this property to Charleston Antiques District, LLC, for $205,000. On November 7, 2001, Drews received a $190,000 note and mortgage from Charleston Antiques as consideration for the purchase. Drews simultaneously assigned this note and mortgage to Effie Drews.

On November 7, 2001, Mrs. Drews gave Lancaster a note for $50,912 that was secured by the assignment of the mortgage on the Meeting Street property. Lancaster explained he received $11,089.63 from the sale, which reduced the balance on the amount the Drewses owed him to $50,912. According to Lancaster, as Charleston Antiques made monthly payments of about $2,400 on its $190,000 note and mortgage, Drews made corresponding monthly payments of about $540, eventually reducing the balance on the $50,912 note to $35,621.12.

Following a three-day jury trial in December 2001, Gordon received a judgment of $50,000 against Drews, plus $15,789.12 in interest. On March 14, 2002, Gordon was awarded $42,693.50 in attorney's fees, for a total judgment of $108,482.62.

Drews appealed the judgment awarded to Gordon. On April 12, 2004, this court affirmed the judgment. *Gordon v. Drews*, 358 S.C. 598, 595 S.E.2d 864 (Ct. App. 2004). On September 22, 2005, the Supreme Court of South Carolina denied certiorari in the matter, and Gordon received an additional award on September 28, 2005, of $1,467.21 in appellate court costs and expenses.

In September 2005, Charleston Antiques sold the Meeting Street property to unrelated third parties. As a result of the sale, Drews, by way of his wife, received the final payment of $130,293.37 on the $190,000 note and mortgage. On September 26, 2005, Lancaster received a final payment of $35,621.12, for which he issued a satisfaction, and assigned back to Effie Drews the $190,000 mortgage.

In August 2006, the circuit court issued an order for supplemental proceedings to aid Gordon in obtaining satisfaction of the judgment. The Master–in–Equity for Charleston County held a hearing in the matter on September 26, 2006; the Master continued the hearing and left the supplemental proceedings open because Drews did not provide certain court-ordered documents. During the hearing, Gordon's attorney expressed suspicion that Effie Drews and Lancaster were "intertwined in this" and indicated she wanted to subpoena Mrs. Drews, Lancaster, and any new property owners counsel deemed necessary to give a full picture of what happened with assets that had once been owned by Drews.

Drews died on September 25, 2007, and his estate was opened the following month. In February 2010, an inventory and appraisement was filed indicating there were no assets in Drews's estate. On February 26, 2010, Lancaster gave a deposition in the supplemental proceedings. During the deposition, Gordon became aware of the transfers between Drews and Lancaster that allegedly resulted in Drews's insolvency.

Effie Drews died on February 27, 2010, two days before she was scheduled to give a deposition in the supplemental proceedings. Her estate was filed on March 30, 2010, with her sister, Jessie B. Atkinson named as personal representative. Effie's estate was valued at $55,460.44.

In November 2010, Gordon filed this action in the Court of Common Pleas for the Ninth Judicial Circuit against Drews's Estate, Effie Drews's Estate, and Lancaster. Gordon later filed a petition in the Charleston County Probate Court against Atkinson in her capacity as personal representative of Effie Drews's estate, Lancaster, and Shirrese Brockington, in her capacity as special administrator of Drews's estate. In November 2011, Gordon settled with Drews's estate and Effie Drews's estate, both of which assigned Gordon their rights against Lancaster. The probate court also issued a consent order for removal of the case to the circuit court.

The present action came before the circuit court on June 13–14, 2013, for a nonjury trial. Following the presentation of testimony by both sides, Lancaster moved for a directed verdict, arguing the judgment Gordon was attempting to collect was extinguished. The circuit court denied the motion.

By order filed August 19, 2013, the circuit court found Gordon proved the fraudulent nature of all the alleged transfers, including the following: (1) the 1992 transfer of $100,000 for the purchase of the Bainbridge property; (2) the Nuffield property substitution; (3) the first mortgage of $40,000 on the Meeting Street property; (4) the second mortgage of $100,000 on the Meeting Street property; (5) the third mortgage of $20,000 on the Meeting Street property; and (6) the assignment of the $190,000 mortgage on the Meeting Street property. The court further noted that "[w]hile some of the transfers between Drews and Lancaster occurred prior to the September 1996 accrual of the underlying action resulting in [Gordon's] [j]udgment, [Gordon] has presented evidence that the transfers between Drews and Lancaster involved actual moral fraud as is required to set aside transfers that occurred before Gordon became a creditor." Based on these findings, the circuit court granted Gordon judgment against Lancaster for $211,677.30. The circuit court later issued a supplemental order dismissing Gordon's claims for constructive trust, civil conspiracy, and negligence/aiding and abetting. Lancaster's post-trial motions were denied, and this appeal followed.

## LAW/ANALYSIS

### I. Enforceability of the Judgment

█ Lancaster argues the judgment Gordon obtained against Drews expired by operation of law before the present action was decided and could not be enforced against Lancaster. We disagree.[3]

---

3. Gordon correctly argues that Lancaster, in requesting dismissal of this action, made a directed verdict motion when he should have moved for an involuntary nonsuit. *See Waterpointe I Prop. Owner's Ass'n v. Paragon, Inc.*, 342 S.C. 454, 458, 536 S.E.2d 878, 880 (Ct. App. 2000) (noting Rule 50, SCRCP "by its nature is applicable to jury trials" and "the proper motion for [the appellant] to have made was a motion for involuntary non-suit under Rule 41, SCRCP"). However, Lancaster's incorrect terminology does not warrant a refusal on the part of this court to address the merits of his motion. *See Dorchester Cty. v. Branton*, 286 S.C. 20, 22, 331 S.E.2d 377, 378 (Ct. App. 1985) (stating the court would overlook the appellants' "semantic lapse and treat their motion as having been properly made for involuntary nonsuit of the case pending against them" so that the appellants "w[ould] not be prevented from having their argument on appeal addressed on its merits").

Section 15–39–30 of the South Carolina Code (2005) currently reads as follows:

**§ 15–39–30. Issuance of executions; effective period.**

Executions may issue upon final judgments or decrees at any time within ten years from the date of the original entry thereof and shall have active energy during such period, without any renewal or renewals thereof, and this whether any return may or may not have been made during such period on such executions.

In *Commercial Credit Loans, Inc. v. Riddle*, 334 S.C. 176, 185, 512 S.E.2d 123, 128 (Ct. App. 1999), this court held that even though the judgment creditor exercised due diligence in discovering the debtor's fraudulent conveyance of property to a third party and attempted to execute upon the wrongfully conveyed property more than one year before the expiration of the ten-year enforcement period, these circumstances did not extend the life of the creditor's judgment beyond the ten-year period provided for in section 15–39–30. In so holding, this court explained:

Here we have an enforcement action wherein Commercial Credit seeks to foreclose its lien against Riddle's property pursuant to a judgment of limited duration. The public policy of this state is to limit the life of a judgment to ten years. While this court does not condone efforts by judgment debtors to secrete assets to avoid payment of judgment, "[a] judgment creditor should recognize this [public] policy and proceed expeditiously to conclude his efforts to collect his judgment within the ten year period."

*Id.* (quoting *Wells ex rel. A.C. Sutton & Sons, Inc. v. Sutton*, 299 S.C. 19, 22, 382 S.E.2d 14, 16 (Ct. App. 1989) (alterations by the court)).

In *The Linda Mc Company v. Shore*, 390 S.C. 543, 553–55, 703 S.E.2d 499, 504–05 (2010), the Supreme Court of South Carolina took a less rigid approach in interpreting section 15–39–30. The judgment at issue in *Linda Mc* was subject to execution and levy until June 2, 2005. *Id.* at 548 n.1, 703 S.E.2d at 501 n.1. By that date, the special referee had conducted a supplemental hearing to determine whether the debtors had assets to satisfy the balance of the judgment. *Id.* at 549–50, 703 S.E.2d at 502. The order authorizing the

58

execution and levy upon debtors' assets was issued June 3, 2005, the day after the judgment expired. *Id.* at 550, 703 S.E.2d at 502. In allowing the execution to proceed, the court stated:

[W]hen a party has complied with the applicable statutes, as Respondent did in this case, and is merely waiting on a court's order regarding execution and levy, the ten year limitation found in section 15–39–30 is extended to when the court finally issues an order. To hold otherwise would put those trying to enforce their judgments at the mercy of the court system to conclude the matter within the ten-year period.

*Id.* at 554–55, 703 S.E.2d at 505. We hold the circuit court in this case correctly ruled that under *Linda Mc,* Gordon could still obtain satisfaction of his judgment because he filed his action against Lancaster within the ten-year statutory period of active energy. *See id.* at 554 n.7, 703 S.E.2d at 505 n.7 (acknowledging the equitable approach of *Hardee v. Lynch,* 212 S.C. 6, 14, 46 S.E.2d 179, 182 (1948), which recognized an exception to nullification of a judgment after ten years if an action was brought prior to the expiration of the ten years). Gordon's amended complaint alleged the judgment remained unsatisfied, and the hearing in the 2006 supplemental proceedings was left open due to the judgment debtor's failure to produce documents. The trial court considered the action as "commenced by [Gordon] to aid in executing on [the j]udgment." We find the action was filed to aid in enforcing the judgment. *See Russell v. City of Columbia,* 305 S.C. 86, 89, 406 S.E.2d 338, 339 (1991) ("[P]leadings in a case should be construed liberally so that substantial justice is done between the parties."). Like the court in *Linda Mc,* we find the action was active because it was filed before the ten-year period expired and Gordon continued to pursue satisfaction of his judgment.[4]

***

4. We decline to address Gordon's additional sustaining ground. *See I'On, L.L.C. v. Town of Mt. Pleasant,* 338 S.C. 406, 420, 526 S.E.2d 716, 723 (2000) (holding when reversing a lower court's decision it is within an appellate court's discretion as to whether to address any additional sustaining grounds).

## II. Fraudulent Conveyances [5]

Lancaster argues the circuit court erred in finding the following transactions constituted fraudulent conveyances: (1) the $100,000 Drews paid to Lancaster in 1992; (2) the $40,000 Lancaster loaned to Drews; and (3) the $20,000 mortgage Drews gave Lancaster. We disagree.

The evidentiary standard governing fraudulent conveyance claims brought under the Statute of Elizabeth is the clear and convincing standard. *Oskin v. Johnson*, 400 S.C. 390, 396, 735 S.E.2d 459, 463 (2012). "An action to set aside a conveyance under the Statute of Elizabeth is an equitable action, and a de novo standard of review applies." *Id.* "However, this broad scope [of review] does not relieve the appellant of his burden to show that the trial court erred in its findings[,] . . . [and] we are not required to disregard the findings of the trial judge, who was in a better position to determine the credibility of the witnesses." *Ballard v. Roberson*, 399 S.C. 588, 593, 733 S.E.2d 107, 109 (2012).

### A. 1992 Payment of $100,000

Lancaster argues the circuit court erred in finding the 1992 payment of $100,000 was a fraudulent conveyance. We disagree.

Section 27–23–10(A) of the South Carolina Code (2007) provides as follows:

Every gift, grant, alienation, bargain, transfer, and conveyance of lands, tenements, or hereditaments, goods and chattels or any of them, or of any lease, rent, commons, or other profit or charge out of the same, by writing or otherwise, and every bond, suit, judgment, and execution which may be had or made to or for any intent or purpose to delay, hinder, or defraud creditors and others of their just and lawful actions, suits, debts, accounts, damages, penalties, and forfeitures must be deemed and taken (only as against that person or persons, his or their heirs, successors, executors, administrators and assigns, and every one of them whose actions, suits, debts, accounts, damages,

---

5. We combine Lancaster's issues challenging separate findings of fraudulent conveyance.

penalties, and forfeitures by guileful, covinous, or fraudulent devices and practices are, must, or might be in any ways disturbed, hindered, delayed, or defrauded) to be clearly and utterly void, frustrate and of no effect, any pretense, color, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding.

In the recent decision of *Judy v. Judy*, 403 S.C. 203, 208–09, 742 S.E.2d 672, 675 (Ct. App. 2013) (internal citations omitted) (first alteration in original), this court stated the following regarding the application of section 27-23-10:

The Statute of Elizabeth "does not limit its application to judgment creditors. Its protection also extends to other types of parties defrauded in connection with the conveyance of property. . . ."

Subsequent creditors may have conveyances set aside when (1) the conveyance was "voluntary," that is, without consideration, and (2) it was made with a view to future indebtedness or with an actual fraudulent intent on the part of the grantor to defraud creditors. Subsequent creditors must show "actual moral fraud," rather than legal fraud. Actual moral fraud involves "a conscious intent to defeat, delay, or hinder [one's] creditors in the collection of their debts." With a voluntary int[ra]-family transfer, the burden shifts to the transferee to establish the transfer was valid.

In determining whether a transferee has met his burden to show the bona fides of a conveyance, the court will look to whether there are indicia of "badges of fraud," including insolvency or indebtedness of the transferor, lack of consideration for the conveyance, a close relationship between the transferor and the transferee, pendency or threat of litigation, secrecy or concealment, departure from the usual method of business, reservation of benefit to the transferor, and the retention by the transferor of possession of the property allegedly conveyed. *Coleman v. Daniel*, 261 S.C. 198, 209, 199 S.E.2d 74, 79 (1973). "[W]he[n] there is a concurrence of several such badges of fraud[,] an inference of fraud may be warranted." *Id.* at 210, 199 S.E.2d at 79 (first alteration in original).

We find the record has evidence of multiple badges of fraud warranting setting aside Drews's 1992 payment to Lancaster.

First, Lancaster was Drews's nephew and there was ample evidence indicating their multiple transactions departed from the usual method of business. Although Lancaster argued the Drewses were debt free in 1992 after they sold their home, there was no documentary evidence the liens had been discharged or the sales proceeds were sufficient to pay off outstanding obligations. To the contrary, Gordon submitted evidence of a federal tax lien of $56,988.85 had been filed against the Drewses in September 2000 for the years 1995, 1996, and 1997. Furthermore, contrary to Lancaster's assertion that the Drewses were able to pay off pending tax liens with the proceeds from the sale of their home in 1992, counsel's questions during the supplemental proceedings suggest the public records show the home sold for only $5 and Drews, though testifying he did not think the house sold for that price, would not reveal what he actually received for the property and could not explain why the stated consideration according to the public records was only $5. Considering the badges of fraud, including Drews's insolvency, the failure to follow the usual formalities in granting a life estate, and Drews's retention of benefits in the funds conveyed, we affirm the circuit court's finding that the 1992 transfer of funds involved actual moral fraud and could be set aside even though it occurred before Gordon became a creditor.

## B.   $40,000 Loan from Lancaster to Drews

Lancaster next argues the circuit court erred in finding the $40,000 he paid to the Drewses between 1993 and 1995 constituted fraudulent conveyances. We disagree.

We find ample evidence in the record indicating the payments were not loans to the Drewses, but rather the payments constituted a surreptitious scheme to return to Drews a portion of the $100,000 Drews provided Lancaster in 1992. Shortly after the Bainbridge purchase, Lancaster obtained a $40,000 open-end, equity line mortgage on the property. From 1993 until 1995, Lancaster paid Drews a total of $40,000. Drews paid the interest on the line of credit. Also, Drews did not acknowledge the debt in writing or make payments to Lancaster on it. Finally, Lancaster presented no evidence of an arrangement with Drews regarding repayment of the alleged loans. We agree with the circuit court's finding that

Lancaster's payments to Drews totaling $40,000 from 1993 until 1995 were for the purpose of returning to Drews part of the $100,000 transfer and involved actual moral fraud.

## C. $20,000 Mortgage

■ Lancaster also argues the circuit court erred in finding the July 1999 mortgage of $20,000 on the Meeting Street property was the result of actual moral fraud. We disagree.

The circuit court noted Lancaster did not give Drews any contemporaneous consideration for the mortgage and no note was executed. Furthermore, the circuit court found "Lancaster gave contradictory testimony that he was not contemporaneously aware of the $20,000 Meeting Street Mortgage while later testifying that he did participate in its genesis and that the purpose of the Third Mortgage was to fund a settlement on a bank guarantee." The circuit court appears to have rejected Lancaster's assertion that Drews granted him the mortgage in return for past consideration. We agree with the circuit court's findings that the $20,000 mortgage was not supported by either contemporaneous or past valuable consideration and constituted actual moral fraud, which were based on credibility determinations. *See Clardy v. Bodolosky,* 383 S.C. 418, 424, 679 S.E.2d 527, 530 (Ct. App. 2009) (explaining the broad scope of review in an equity proceeding "does not require this court to ignore the findings below when the trial court was in a better position to evaluate the credibility of the witnesses").

## III. Directed Verdict and Post–Trial Motions

Lancaster finally argues the circuit court erred in denying his motion for directed verdict and his post-trial motions seeking reconsideration. We disagree.[6]

■ "After the plaintiff in an action tried by the court without a jury has completed the presentation of his evidence, the defendant, ... may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief." Rule 41(b), SCRCP. Rule 41(b), SCRCP, "allows the judge as the trier of facts to weigh the evidence,

---

6. As previously noted, we address the directed verdict issue as if it was properly raised as a motion for involuntary nonsuit under Rule 41(b), SCRCP.

determine the facts and render a judgment against the plaintiff at the close of his case if justified." *Johnson v. J.P. Stevens & Co.*, 308 S.C. 116, 118, 417 S.E.2d 527, 529 (1992). In reviewing the rulings of a trial judge on motions for involuntary nonsuit, this court must review the evidence and all inferences in the light most favorable to the nonmoving party. *Rewis v. Grand Strand Gen. Hosp.*, 290 S.C. 40, 41–2, 348 S.E.2d 173, 174 (1986). If more than one reasonable inference can be drawn from the evidence, the motion for nonsuit must be denied. *Id.*

In support of his argument, Lancaster reiterates the arguments previously discussed. We find no error by the circuit court on the merits of those arguments; thus, we affirm the circuit court's denial of Lancaster's motion for involuntary nonsuit and post-trial motions for reconsideration.

## CONCLUSION

For the foregoing reasons, the order on appeal is

**AFFIRMED.**

WILLIAMS, J., concurs.

THOMAS, J., dissenting:

I respectfully dissent and would reverse the circuit court's order because the judgment Respondent obtained against Rudolph Robert Drews expired by operation of law before the present action was decided and, thus, could not be enforced against Appellant. I disagree with the majority's reliance on *Linda Mc* [7] and find the circumstances in this case are distinguishable from those in *Linda Mc.*

As of March 18, 2012, the final day of the ten-year period following enrollment of the judgment, Respondent had only filed the present action in the circuit court and settled his allegations against the Drews' estates. Although Respondent filed this action prior to the expiration of the ten-year period, he was not "merely waiting on the court's order regarding execution and levy" as was the situation in *Linda Mc. See Linda Mc*, 390 S.C. at 554, 703 S.E.2d at 505 ("[W]hen a party has complied with the applicable statutes, as [r]espondent did in this case, and is merely waiting on a court's order regarding execution and levy, the ten year limitation found in section 15–

---

7. *Linda Mc Co. v. Shore*, 390 S.C. 543, 703 S.E.2d 499 (2010).

39–30 is extended to when the court finally issues an order."). Indeed, the circuit court did not hold the final hearing in this case until June 2013, more than one year after the expiration of the ten-year period. Based on the facts distinguishing this case and *Linda Mc*, I would decline Respondent's invitation to extend *Linda Mc*'s narrow holding to encompass these circumstances. *See id.* ("We want to stress that this is a narrow holding limited to facts similar to those at issue in this case."). I believe extending *Linda Mc* in this case thwarts the public policy of this state that limits the life of a judgment to ten years. *See Commercial Credit Loans, Inc. v. Riddle*, 334 S.C. 176, 185, 512 S.E.2d 123, 128 (Ct. App. 1999) ("The public policy of this state is to limit the life of a judgment to ten years."). Additionally, because the majority concludes Respondent's action was active simply because he filed it prior to the expiration of the ten-year period, the majority's interpretation could effectively allow any judgment holder to extend automatically the ten-year period by merely filing a new action to execute prior to the expiration of the ten-year period.

Accordingly, I would reverse the circuit court's order because Respondent's judgment against Drews expired prior to the circuit court deciding the present action and the narrow exception in *Linda Mc* is inapplicable.